UNITED STATES of America, Appellee,

v.

Myles E. BILLUPS, Sr., Appellant.

No. 81–5213.

United States Court of Appeals, Fourth Circuit.

Argued April 1, 1982.

Decided Oct. 15, 1982.

See also, D.C., 522 F.Supp. 935.

Stanley E. Sacks, Andrew M. Sacks, Norfolk, Va. (James C. Lewis, Sacks, Sacks & Larkin, Norfolk, Va., on brief), for appellant.

Justin W. Williams & Theodore S. Greenberg, Asst. U.S. Attys. (Elsie L. Munsell, U.S. Atty. and Phillip Krajewski, Asst. U.S. Atty., Alexandria, Va., on brief), for appellee.

Before BUTZNER and SPROUSE, Circuit Judges, and KISER,* District Judge.

SPROUSE, Circuit Judge:

Myles Billups Sr. appeals his multiple convictions, entered after a jury trial, for violating the Hobbs Act, 18 U.S.C. § 1951, the Travel Act, 18 U.S.C. § 1952(a)(3), and for two violations of the criminal provisions of the Taft-Hartley Act, 29 U.S.C. § 186(b)(1).[1] He challenges the venue of the district court on one Taft-Hartley count, certain evidentiary rulings of the trial judge, comments made by the judge in the jury's presence, the district court's refusal to grant a new trial based on juror prejudice, and the government's withholding of allegedly exculpatory material. He also appeals the trial court's denial of a judgment of acquittal on the Hobbs Act count, alleging that the government failed to prove that statute's requisite "fear" element. We affirm.

## I.

Billups was an International Vice-President of the International Longshoremen's Association (ILA) at Norfolk, Virginia, obtaining that post after many years of work and union activity on the waterfront. In essence, the government's case charged that Billups abused his office through a series of illegal transactions involving extortion and

---

* Honorable Jackson L. Kiser, United States District Judge for the Western District of Virginia, sitting by designation.

1. Billups was originally indicted under a ten-count indictment. At trial, two Taft-Hartley counts were dismissed. The jury rendered not guilty verdicts on two counts alleging Taft-Hartley violations, and on single counts alleging violations of the Hobbs and Travel Acts.

the receipt of payoffs from maritime employers operating in the Norfolk/Hampton Roads area. More specifically, the Hobbs Act and Travel Act charges against Billups were based on incidents relating to his extortion of funds from a waterfront employer in order to "settle" a claim relating to the unloading of a freighter by nonunion labor—the Lash Pacifico transaction. The Taft-Hartley counts were based on Billups' activity in furnishing ILA longshoremen to a stevedoring company in the Hampton Roads area—the Quin Marine dealings.

### The Lash Pacifico Transaction

In August 1975, the ship S.S. Lash Pacifico, a freighter owned by Prudential Lines, encountered difficulty unloading at the Norfolk port and had to be unloaded at the Portsmouth, Virginia, naval yard by Navy personnel. In due course, the ILA claimed a contractual violation by Prudential for this work performed by non-ILA members. John Marano, a former executive vice-president of Prudential, testified that he contacted Prudential's stevedoring contractor, Nacirema, and was told that the union's claim for wages could be limited to $29,000, but that Myles Billups would have to be contacted to arrange this. Marano notified his superior at Prudential of this, indicating that the ILA claim could possibly run upwards of $130,000. In September 1975, Marano telephoned Billups and, according to Marano, Billups stated that the claim could be reduced upon the payment to him of $10,000. Marano met with Prudential's board chairman, Spiros Skouras, who told Marano to "handle" the matter, but that Prudential would not be a party to illegal activity. Nevertheless, Marano again contacted Billups, who indicated a desire to deal directly with Prudential in this matter and in cash.

Shortly thereafter, Billups notified Marano that he would be in New York and would stop to see him. Marano and a confederate, Mark Cappell, contacted Howard, a Nacirema official, asking that Nacirema inflate its future bills to Prudential, thus generating the money allegedly needed to bribe Billups. After initially rebuffing the plan, Nacirema's president agreed and gave Cappell a check for $10,000. Upon encountering difficulty in cashing the check at a New York bank, Cappell gave it to Marano, who then attempted to give it to the appellant. Billups refused the check, insisting on cash, and castigated Marano for "dragging his feet" in raising the $10,000.

Marano testified that Billups continually reminded him of this $10,000 "debt," and in an effort to raise the funds, Marano padded his expenses from a business trip to Morocco. In December, 1975, Marano met with Billups at Prudential headquarters in New York and delivered $4,000 in cash to him.

Marano left employment at Prudential shortly thereafter, and became an undercover agent after FBI agents confronted him with evidence of other waterfront crimes in which he was involved. At the FBI's behest, Marano arranged to meet with Billups in Norfolk, and deliver $1,000, purportedly to "make good" on the Lash Pacifico deal. Marano was equipped with an electronic recording device, and tapes of the Billups/Marano meeting were used as evidence at Billups' trial.

Billups at trial presented a different picture of these transactions. He denied receiving or requesting any money from Prudential or Marano, and contended that Marano had approached him and offered to donate $10,000 to an ILA charity as a token of appreciation for the handling of the Lash Pacifico incident. According to Billups, none of this was necessary, as the Contract Adjustment Board in Norfolk had set the ILA's Lash Pacifico claims at $29,000. Billups testified that he told Marano that if he cared to make such a donation, a $5,000 gift to the Eastern Virginia Medical School would be adequate, and that he refused a $10,000 check from Marano because it was not made out to the medical school. At trial, Billups denied that statements recorded during the conversation with Marano were his, and denied any involvement in the solicitation or receipt of money for influencing ILA actions regarding the Lash Pacifico incident. The jury, however, found Billups

guilty of one Hobbs Act violation and one violation of the Travel Act.

### The Quin Marine Dealings

Quin Marine is a New York-based concern which provides support services to shipping companies, and in 1976, it expanded its operations to the Norfolk, Virginia, waterfront. In order to operate, Quin Marine found it necessary to secure a "work gang," a regularly assigned crew of ILA members. According to its general manager, William "Sonny" Montella, Quin Marine was initially rebuffed in these efforts by the local ILA. Montella testified that he contacted Billups for assistance, and that after Billups spoke on its behalf, Quin Marine obtained the needed work gangs. Montella further testified that shortly thereafter, he met Billups at the Omni Hotel in Norfolk and offered him $500 as "gratuity" for his help. Montella stated that although initially reluctant Billups took the money.

In the fall of 1977, Quin Marine was faced with a potential wildcat strike by ILA container repairmen. Montella stated that he met with Billups, who then "corrected" the problem. Montella testified that he thereafter gave Billups $1,000 in cash as a token of appreciation, and that he gave Billups a second $1,000 "gratuity" in January 1978, in accord with the waterfront "tradition" of Christmas gratuities from employers to ILA leaders.

Montella's involvement in illegal payments to labor and management officials on the waterfront was discovered by the FBI, and in May 1978 he became an undercover agent. He met with Billups at the Wienerwald restaurant in New York City in August 1978 and passed him an envelope containing $2,000. During the meeting, Montella was equipped with an electronic tape recorder and was observed by an FBI agent. Montella met with Billups under similar circumstances at the Omni Hotel in Norfolk in October 1978 and gave him an envelope containing $1,000. At trial, Billups denied taking money and denied that it was his voice on the tapes of the purported

Montella meetings introduced at trial. Billups' two Taft-Hartley convictions were based on these August and October transactions.

### II.

### A.

Billups contends on appeal that the nondisclosure of certain information by a juror during *voir dire* denied him a fair trial, and that his conviction therefore violated the fifth and sixth amendments.

Due to the large amount of publicity surrounding Billups' trial, the district judge required each prospective juror to complete a written questionnaire, and submit to oral examination (in groups of four or five) in chambers. One written question asked "[a]re you or any immediate member of your family a member of a labor union, and, if so, designate the name of the union and its local number, if any." Another question asked "[h]ave you or any immediate member of your family ever been employed or done business with anyone in the waterfront industry?" The juror in question, Jadis Battle, gave a "no" response to the first question and a "yes" answer to the second.

Other prospective jurors in Battle's group asked the trial judge in chambers whether the question meant "currently" a member of a union, or "ever had been" a union member—commenting that retired members of their families had been in a union. The judge noted their responses and "amended their answers accordingly." Battle said nothing during or after this colloquy, neither the prosecutors or Billups' attorneys questioned her, and she was selected to serve on the jury. After the trial, Billups discovered that Battle's son William was in fact a member of the ILA, albeit unemployed as a longshoreman, at the time of the *voir dire*. A post-trial evidentiary hearing was held by the district judge, during which Battle was interrogated both by the judge and counsel. She testified that at the time of *voir dire*, she thought her son was a *former* member of the ILA, but later

discovered he was in fact an inactive member, not in good standing for failure to pay his dues. The defense moved for a new trial on the ground of juror misconduct, contending that Battle heard other prospective jurors ask whether the question meant "current" or "current and past" union membership, and by her silence concealed a "material fact." They further argued that there was animosity between William Battle's local union and Billups, and that William Battle told an associate that Billups "was getting what was coming to him." William Battle did not testify at the post-trial hearing.

The appellant first argues that since juror Battle is related to someone who *might* be biased against Billups, *she* is presumed to be biased. He next contends that the juror's failure to speak up and amend her answers at *voir dire* was tantamount to deliberate concealment, a sure indicium of bias. Finally, he maintains that even if the omission was unintentional, a new trial is necessary to preserve the "fairness" of the jury system.

■ The Supreme Court recently examined the problem of alleged juror misconduct discovered after conviction, and declined to hold that any "implied bias" automatically requires a new trial. The Court concluded instead that a post-trial hearing affording the defendant an opportunity to prove actual bias fulfills the requirements of due process. *Smith v. Phillips,* 455 U.S. 209, 216, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982). That was precisely the procedure followed in this case. At the post-trial hearing, Judge Hoffman and attorneys for Billups and the government interrogated Battle, and Billups had the opportunity to present testimony bearing on her ability to render an impartial verdict. A review of the record indicates that Judge Hoffman concluded that Battle's omission was inadvertent, and that while her son conceivably could have been prejudiced against Billups, there was no showing that his alleged bad feelings towards Billups poisoned juror Battle's mind. *See United States v. Bynum,* 634 F.2d 768 (4th Cir. 1980). The record supports these conclusions, and we cannot say that the district court erred in finding that juror Battle did not harbor "actual bias" against Billups.

### B.

Billups next contends that the government withheld exculpatory material after he filed a request for it. He argues that Prudential Lines conducted an in-house investigation of Marano and Cappell after Marano's employment terminated, that the FBI knew of those investigations and had received copies of at least a portion of investigatory reports which dealt with Marano and his dealings at Prudential. He further argues that such material is exculpatory in that it supports an inference that Billups was an unknowing dupe in a complex scheme, engineered by Marano and Cappell, to defraud Prudential. The government responds that it was unaware of the report, that the defense apparently knew of it prior to trial, taking no steps to acquire it, and that in any event, it did not tend to exculpate Billups or impeach the testimony of Marano.

■ It is true that when a specific request for certain material has been made the failure of the government to respond is "seldom, if ever, excusable." *United States v. Agurs,* 427 U.S. 97, 106, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Billups filed voluminous documents prior to trial requesting the government's release of *Brady* material. Although these pretrial motions contained over 25 *Brady* requests, each was general in nature. None requested Prudential reports in the hands of the government, and we cannot construe any of the motions as generically including the material in question. *Chavis v. North Carolina,* 637 F.2d 213, 224 (4th Cir. 1980). Thus, the request was not a "specific request for certain material."

Billups' challenge, therefore, is viewed under the rule announced in *Agurs, supra,* governing the voluntary production or the production after a general request for exculpatory material:

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* 427 U.S. at 112–13, 96 S.Ct. at 2401–02.

The material discovered post-trial and produced for examination by the district court consisted of documents relating to the tax-evasion guilty plea of Keith Nelson, a former Prudential employee, in which he states that Marano and Cappell were involved in payoff and kickback schemes, and reports of one Billy Carter, a private investigator hired by Prudential, involving allegedly illegal activities of Marano and Cappell while at Prudential, which were discovered in the files of the United States Customs Service. Searches of the government's archives both during and after the trial failed to produce any Prudential investigative report dealing with Marano or Billups.

▉ There is substantial direct evidence of Billups' accepting cash payments from Marano. Marano freely admitted his past wrongs while on the witness stand, so there was little, if any, impeachment value in the later-discovered material. The material, if weighed with all the evidence, would not have tended to create a reasonable doubt that Billups sought and accepted illegal payoffs from Marano. Therefore, we cannot agree that constitutional error occurred.

## III.

Billups next argues that certain comments of the district judge in the jury's presence were prejudicial and denied him a fair trial.

A critical link in the government's evidentiary chain was a series of audio tapes of meetings between Billups and Marano and meetings between Billups and Montella. At trial, Billups essentially denied that certain inculpatory statements in the recorded conversations were made by him and testified that it was not his voice on the tapes produced at trial. While Billups was testifying, the following colloquy took place:

> *The Court:* Was anybody else with you and Mr. Marano at the time of your meeting?
>
> *Mr. Billups:* No sir.
>
> *The Court:* Well, can you recognize Mr. Marano's voice?
>
> *Mr. Billups:* Yes sir.
>
> *The Court:* Well, who do you think would be the other voice, a ghost?

Billups' attorneys objected to this exchange the following day at a conference in the judges' chambers. An offer of an immediate limiting instruction was refused by defense counsel for tactical reasons, and the trial judge at the close of the trial gave the jury the following instruction:

> The law does provide me the privilege of commenting to the jury on the evidence in the case. Such comments are only expressions of the judge's opinion as to the facts and the jury may disregard entirely, since the jurors are the sole judges of the facts. Probably during the lengthy trial I have made some statement perhaps in attempted humor which would possibly be construed by you as a comment on the evidence in the case. I now charge you in addition to what I have just stated that you should disregard any comment by me during the trial and prior to giving this charge, as the law is clear

that the credibility of a witness is solely for your determination.

In his post-trial memorandum, the trial judge concluded that, in retrospect, the remark "probably should not have been made," but if it was error, the defendant waived it by failing to object at the first opportunity at which the jury was not present. Federal Rule of Evidence 614 provides:

> (a) **Calling by court.** The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

> (b) **Interrogation by court.** The court may interrogate witnesses, whether called by itself or by a party.

> (c) **Objections.** Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present.

The record discloses that Billups was the last witness on the day in question, March 23, and when the trial resumed the next day, March 24, he took the stand as the first witness. The defense, therefore, had two opportunities, at the end of the day on the 23d and at the beginning of proceedings on the 24th, when the jury was not present, to object to Judge Hoffman's interrogation.

■ As the Advisory Committee's Notes to Rule 614(c) make clear, the rule is "designed to relieve counsel of the embarrassment attendant upon objecting to questions by the judge in the presence of the jury, while at the same time assuring that objections are made in apt time to afford

the opportunity to take possible corrective measures." Billups attorneys, by waiting until *after* his testimony to raise the issue with Judge Hoffman defeated the purpose of the rule by preventing the contemporaneous correction of the perceived error, and thus waived any objection on appeal. Additionally, we have examined the entire record and conclude that while the court's remarks may have been improvident, they did not deprive Billups of a fair trial before an impartial judge and jury, *see United States v. Cole*, 491 F.2d 1276, 1278 (4th Cir. 1974); *United States v. Cunningham*, 423 F.2d 1269, 1276 (4th Cir. 1970), and that the judge's curative instructions served to assist the jury in giving proper weight to his comments.

## IV.

Billups next contends that the trial court erred in not granting his motion for a judgment of acquittal on the Travel Act count.[2] The indictment charged that Billups traveled to New York in December, 1975, to meet Marano, intending to engage in bribery in violation of New York law, and that he thereafter performed acts in furtherance of that unlawful activity. Billups argues that while he did meet with Marano in New York in December, his intent when he began the interstate trip controls, and that the purpose of his trip was to conduct legitimate union business.

■ A review of the record discloses ample evidence from which the jury could conclude that Billups travelled from Virginia to New York intending to meet with Marano and to illegally receive money in order to favorably exert his influence within the ILA. The trial court therefore properly allowed the jury to consider this count.

---

**2.** The Travel Act, 18 U.S.C. § 1952, provides in pertinent part:

> (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

. . . .

> (b)(2) [carry on] extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

## V.

Relying on Federal Rules of Evidence 403 and 404,[3] Billups next challenges the admission of "prior bad acts" evidence relating to two separate series of incidents.

## A.

At trial, the government introduced testimony relating to the receipt by Billups of a $500 gratuity from Sonny Montella in October 1976 and of a $1,000 payment from John Marano in August 1977. Each of these transactions had been the subject of an indictment count that was dismissed by the trial judge. The trial judge ruled that the evidence was relevant to show Billups' "opportunity" to take payoffs and to show knowledge, intent, motive and capacity. Billups argues that the opportunity or ability to meet waterfront employees was conceded, so admission on that ground was irrelevant. Also, the limiting instruction to the jury was confined to the opportunity ground, rendering the court's other justifications invalid.

The trial judge instructed the jury at the time of Montella's testimony as follows:

THE COURT: Now I say, ladies and gentlemen of the jury, specifically in this connection without suggesting that there was or was not any $500 that was transferred from

Mr. Montella to Mr. Billups I want you to know that Mr. Billups is not charged with any specific offense involving the $500. *The main purpose of the admissibility of this evidence is to show what such opportunity if any that you think on the part of Mr. Billups may have had by reason of that act in connection with future acts, not for that act alone.*

■ If the government's other evidence was to be believed, it presented a pattern of transactions between Billups and Montella, and the challenged evidence was clearly relevant to show the development of a common plan or scheme. Billups' argument focuses on the word "opportunity" in the limiting instruction. While the fact of his ILA office provides evidence of "opportunity" to take money from employers for union favors, thus diminishing the need for further proof on that point, the instruction as a whole clearly contemplates consideration of the $500 payment in light of the entire series of transactions. We believe, therefore, that the district court did not abuse its discretion in admitting this testimony.

Marano's testimony regarding his payment to Billups of $1,000 on August 1, 1977, was likewise admissible. Marano testified that this payment was to partially satisfy his $10,000 "debt" to Billups, and was plainly relevant to complete the picture of a "common plan or scheme." The evidence

---

**3.** **Rule 403.**

**EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION, OR WASTE OF TIME**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**Rule 404.**
**CHARACTER EVIDENCE NOT ADMISSIBLE TO PROVE CONDUCT; EXCEPTIONS; OTHER CRIMES**
**(a) Character evidence generally.** Evidence of a person's character or trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;
(2) *Character of victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
(3) *Character of witness.* Evidence of the character of a witness, as provided in Rules 607, 608, and 609.
**(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

was relevant and probative, and the limiting instruction to the jury, while not as complete as it should have been, clearly stated to the jury that it "cannot find him guilty" for the August 1 transaction.

### B.

Billups' other "bad act" evidentiary challenge relates to the rebuttal testimony of Embri Stokes, the president of an ILA local, that Billups solicited payoffs from him over a long period of time. Fourteen waterfront employers had testified, during Billups' case in chief, that Billups never solicited gratuities or payoffs from them in return for his "services" as a union leader. The Secretary-Treasurer of ILA Local 1248 in Norfolk, testified that Billups had a good reputation for honesty, and related the manner in which Billups ran union meetings so as to preserve the appearance of "above board" dealings. Billups on direct examination denied soliciting or accepting "anything" from waterfront employers. He denied accepting "under the table" payments from employers or from local union presidents, particularly Embri Stokes.

Stokes then testified on rebuttal that, over the course of several years, he gave Billups gratuities in exchange for Billups' favorable action on the issuance of additional port numbers, settlement of jurisdictional disputes and other actions benefitting Stokes' local. Billups contends admission of this testimony was error in that it violated the express provisions of Rule 404(b), was unduly prejudicial under Rule 403, and was inadmissible to impeach his general denials on cross-examination.

This court met a similar contention in *United States v. Johnson*, 634 F.2d 735 (4th Cir. 1980), *cert. denied*, 451 U.S. 907,

101 S.Ct. 1974, 68 L.Ed.2d 295 (1981), and what we said there is directly applicable here:

> Particularly where, as here, a defendant in a criminal case by her own testimony and that of others has deliberately sought as the primary means of defense to depict herself as one whose essential philosophy and habitual conduct in life is completely at odds with the possession of a state of mind requisite to guilt of the offense charged, that defendant may be considered in effect to have forfeited any protection that the first sentence of the Rule might otherwise have provided against the type of "other act" evidence here challenged. *See Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

*Id.* at 737–38. Balancing the probative value of the challenged evidence against its potential for prejudice to Billups' defense, we hold that the trial judge acted within his discretion in admitting it.[4]

### VI.

We find no merit in Billups' contention that there was insufficient evidence upon which to base the jury's instruction of consciousness of guilt. The court informed the jury:

> Without suggesting that there was or was not an attempt to suppress or fabricate evidence by the defendant after a crime has been committed, that, alone, is not, of course, sufficient to establish guilt. Of course either the prosecution or its attorneys or the defendant or his attorneys have a perfect right to interview prospective witnesses in any case. You may consider evidence of such attempts if it existed. However along with the other

---

**4.** Billups further argues that Stokes' testimony would only have been admissible if he were an *employer,* a member of the same "class" as the employer witnesses. Not only do the facts in *Johnson* disarm this argument, but it borders on the incredible to urge that the fourteen employer witnesses were presented to prove that Billups was honest and upstanding *only* as to employers. The direct evidence of good character offered by Billups was intertwined with the principal issue of whether he extorted money. *See United States v. Benedetto,* 571 F.2d 1246 (2d Cir. 1978).

In light of our holding that Stokes' testimony was admissible to rebut the testimony of the employers presented in Billups' case in chief, we need not address the propriety of its use to impeach Billups' testimony on cross-examination. *See United States v. Pantone,* 609 F.2d 675 (3d Cir. 1979).

evidence in the case in determining guilt or innocence, whether or not it attempts the fabrication or suppression of evidence showing consciousness of guilt and a significance to be attached to any such attempt are matters for the jury to determine.

As we have previously stated, "[t]he law is well established that, in a criminal case, evidence of a defendant's attempt to influence a witness to testify regardless of the truth is admissible against him on the issue of criminal intent." *United States v. Reamer,* 589 F.2d 769, 770 (4th Cir. 1978), *cert. denied,* 440 U.S. 980, 99 S.Ct. 1787, 60 L.Ed.2d 240 (1979). The testimony of Charles Chambers, Nacirema's stevedoring supervisor, provided sufficient evidence to support the instruction.[5] He testified that Billups approached him on two occasions attempting to tailor Chamber's version of Marano's contributions to support Billups' position that they were for charitable purposes.

## VII.

The indictment charged that Billups violated the Hobbs Act, 18 U.S.C. § 1951,[6] by extorting and attempting to extort $10,000 from Marano "induced by the wrongful use of fear." Billups argues that there was insufficient evidence of fear to sustain his conviction for violating this section.

Billups bases his argument for reversal on John Marano's testimony, on cross-examination, that he "really couldn't say there was fear" in his dealings with Billups. On re-direct examination by the government the following colloquy took place:

Q. When you were dealing with Mr. Billups in November and December of 1975 did you and Prudential have any fear, any economic concerns in your dealings with Mr. Billups?

A. Well, the problem was we wanted to conclude the agreement with Mr. Billups so that we had no problems with the ILA in Norfolk.

The government contends that this testimony, coupled with Marano's "genuine and reasonable" fear that failure to pay Billups the amount promised would lead to labor unrest at Prudential was sufficient to fulfill the Hobbs Act's fear requirement.

Fear of economic harm is, of course, sufficient to sustain a Hobbs Act violation, *United States v. Iozzi,* 420 F.2d 512, 515 (4th Cir. 1970), *cert. denied,* 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1971). The fear need not be the consequence of a direct or implicit threat by the defendant, *United States v. Duhon,* 565 F.2d 345 (5th Cir.), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978), and the government's burden of proof is satisfied if it shows that the victim feared an economic harm, and that the circumstances surrounding the alleged extortionate conduct rendered that fear reasonable. *United States v. Sander,* 615 F.2d 215 (5th Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980).

Given the fact that Marano initiated dealings with Billups, it is arguable that the crime involved here was bribery, not extortion. *See United States v. Rabbitt,* 583 F.2d 1014 (8th Cir.), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75

5. Further support for this instruction is found in *United States v. McDougald,* 650 F.2d 532, 533 (4th Cir. 1981), in which we held that where the defendant makes specific exculpatory statements of fact which are later contradicted at trial, the jury may infer from them a consciousness of guilt.

6. The Hobbs Act, 18 U.S.C. § 1951, provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires

so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(1978); *see generally United States v. Cerilli,* 603 F.2d 415, 427–37 (3d Cir. 1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), (Aldisert, J., dissenting). However, bribery and extortion are not mutually exclusive, *United States v. Furey,* 491 F.Supp. 1048, 1057 (E.D.Pa.1980), *aff'd,* 636 F.2d 1211 (3d Cir. 1981), and so long as the defendant intends to exploit the reasonable fear of the victim, *Duhon, supra* 565 F.2d at 351, his actions will constitute extortion under the Hobbs Act. The jury was presented with sufficient evidence from which it could conclude that although Marano may have initiated the payoff scheme, the payment and promises of payment to Billups were the direct result of a perceived, reasonable fear on Marano's part that noncompliance with the deal already struck could lead to Billups' economic retaliation.[7]

## VIII.

Finally, we disagree with Billups' argument that venue in the Eastern District of Virginia was improper for trial of count eight of the indictment alleging a violation of 29 U.S.C. § 186(b)(1).

### A.

The indictment on which Billups was convicted charged in pertinent part that:

2. On or about August 11, 1978, in the Eastern District of Virginia and elsewhere, the defendant MYLES E. BILLUPS, SR., being a representative of employees who were employed in an industry affecting commerce, to-wit, Vice-President of the I.L.A., Vice-President of the Atlantic Coast District Council of the I.L.A., President of Hampton Roads District Council of the I.L.A., and President of I.L.A. Local 1970, did knowingly, willfully and unlawfully receive, accept, and agree to receive and accept a payment and delivery of money from William A. Montella, a representative of Quin Marine, the employer of such employees. (In violation of Title 29, United States Code, Section 186(b)(1) and (d)).

The Taft-Hartley Act, 29 U.S.C. Section 186(a)(1) and (b)(1), states in relevant part:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

29 U.S.C. § 186(a)(1), (b)(1).

The government's principal evidence as to count eight of the indictment was provided by the testimony of William "Sonny" Montella. In essence, Montella testified that while he was in New York, Billups telephoned him from New York and asked that they meet. The meeting was arranged for the Wienerwald Restaurant, also in New York. At the restaurant, Montella passed Billups an envelope containing $2,000 in cash. The offer and acceptance of the payment therefore was proved to have occurred in New York. The proof linking Billups' acceptance of the money in New York with the Eastern District of Virginia was the fact that the working relationship between Quin Marine and Billups was focused on the Hampton Roads area—admittedly sufficient to show that commerce in

---

7. We likewise find no merit to Billups' contention that there was insufficient evidence that the extortion would "affect commerce." As we stated in *United States v. Santoni,* 585 F.2d 667 (4th Cir. 1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979), even a *de minimis* effect on commerce resulting from a Hobbs Act extortion is sufficient to bring the charged criminal activity within the statute. The evidence adduced at trial was sufficient to prove that Prudential was engaged in activities affecting interstate commerce, and that the potential payment of the $10,000 and the actual payment of the $4,000 would affect transactions in commerce.

the Hampton Roads area was "affected" by the receipt of the money.[8] The trial court concluded that venue for prosecutions under 29 U.S.C. § 186(b)(1) is proper in districts where commerce was thus "affected," regardless of where payment took place. We agree.

### B.

Venue in a federal criminal case is an issue of constitutional dimension. Article III guarantees a federal defendant a trial "in the State where the said Crimes shall have been committed" and the sixth amendment provides him with a "jury of the State and district wherein the crime shall have been committed." These fundamental guarantees have been implemented by Federal Rule of Criminal Procedure 18 which provides that "[e]xcept as otherwise permitted by statute or these rules, the prosecution shall be had in a district in which the offense was committed." The critical inquiry in this case is deciding where the crime alleged was committed, since 29 U.S.C. § 186(b) does not by its terms specify the situs of the offense there defined. See Johnston v. United States, 351 U.S. 215, 220, 76 S.Ct. 739, 742, 100 L.Ed. 1097 (1956). Since Congress has not explicitly provided for venue under section 186(b), the situs of the offense "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." United States v. Anderson, 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946). The usual method for making this determination, one which we have consistently approved, is an examination of the verbs employed in the statute to define the offense, United States v. Kibler, 667 F.2d 452, 454 (4th Cir.), cert. denied, —— U.S. ——, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982); United States v. Blecker, 657 F.2d 629, 632 (4th Cir.1981); United States v. Walden, 464 F.2d 1015, 1018 (4th Cir.), cert. denied, 409 U.S. 867, 93 S.Ct. 165, 34 L.Ed.2d 116 (1972), 410 U.S. 969 (1973), although this method is not exclusive. As Judge Hoffman points out in his able opinion ruling on this point in the district court proceeding, there are crimes where the situs is not so simple of definition. So it is here—we cannot so easily garner and apply to the statute involved all of the rationale of Article III, the sixth amendment and Rule 18 from one single verb. The protected interest is in Virginia where commerce is affected, however, and other basic venue considerations flow from that reality.

Neither we nor any other circuit have considered the question of whether venue for trial of a section 186 violation lies in a district where commerce has been affected by an illegal offer or acceptance completed in another district. However, it has been held that venue for a Hobbs Act violation will lie wherever commerce is affected,[9] and the government contends that the same rationale applies to this Taft-Hartley Act violation.

The Hobbs Act, 18 U.S.C. § 1951(a), covers a broad spectrum of crimes affecting any activity in interstate commerce, whereas section 186 of the Taft-Hartley Act relates only to the giving of anything of value by a person of a specified class to representatives of employees of an industry affecting commerce.[10]

---

8. The parties stipulated that Montella's company, Quin Marine, was engaged in commerce, and the jury was instructed, apparently in reliance on that stipulation, that:

it is not necessary for the Government to prove that that act of receiving or accepting such money took place in Virginia. It is sufficient for the Government to prove beyond a reasonable doubt that the defendant took the money and was at the time a representative of ILA members employed in the Port of Hampton Roads by Quin Marine Services. It has already been stipulated, of course, that Quin Marine Services was an industry affecting commerce.

9. United States v. Craig, 573 F.2d 513 (7th Cir.), cert. denied, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978).

10. The Hobbs Act provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or

The courts construing congressional intent as to venue in Hobbs Act violations have determined that venue lies wherever commerce is affected *or* wherever the robbery, extortion, attempt, conspiracy or threat occurs, *Craig, supra; United States v. Floyd,* 228 F.2d 913 (7th Cir.), *cert. denied,* 351 U.S. 938, 76 S.Ct. 835, 100 L.Ed. 1466 (1956), and the Seventh Circuit in *Floyd* concluded that:

> the [Hobbs Act extortion] offense consists of two essential elements, (1) extortion or attempted extortion, and (2) that such extortion or attempted extortion affect interstate commerce. In our judgment, and we so hold, venue may be properly laid either in the jurisdiction wherein the coercion is perpetrated or in that wherein commerce is affected thereby.

*Id.* at 919.

We cannot agree with the government that the entire rationale of the opinion in *Floyd* applies to the case *sub judice* because of the widely differing purposes of the Hobbs Act and the Taft-Hartley Act. We do agree, however, that one element of a section 186(b) Taft-Hartley offense is that the "giving" must be proved to be to a representative of an employee of an industry affecting commerce. In other words, if a donor or offerer were to give or offer a thing of value to a person other than a representative of an employee of a commerce-affecting industry, there would be no offense under that section. Although worded differently, a *sine qua non* of a section 186(b) violation is that the forbidden act affect commerce. The same venue rationale, then, applies to this Taft-Hartley violation as applies to a Hobbs Act violation. Venue lies either wherever commerce is affected or wherever the proscribed act occurs.

AFFIRMED.