848 F.2d 186
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bob D. SCRUGGS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terrence Lee LEWIS, Defendant-Appellant.
 Nos. 87-5603(L), 87-5608.
 United States Court of Appeals, Fourth Circuit.
 Argued: Feb. 5, 1988.
Decided: May 17, 1988.
 
 John DeWitt Cline (Williams & Connolly, on brief), Thomas R. Dyson, Jr., for appellants.
 Kent S. Robinson, II, Assistant United States Attorney (Henry E. Hudson, United States Attorney, on brief), for appellee.
 Before WILKINSON and HAYNSWORTH, Circuit Judges, and THOMAS SELBY ELLIS, III, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 On April 14, 1987, appellants Terrence Lewis and Bob Scruggs were indicted with Dennis Flanders and Kyle Myers for (i) conspiring to defraud the Internal Revenue Service, in violation of 18 U.S.C. Sec. 371, (ii) filing false tax returns, in violation of 26 U.S.C. Sec. 7206(1), and (iii) making false statements, in violation of 18 U.S.C. Sec. 1001. Flanders and Myers pleaded guilty. Appellants Lewis and Scruggs were tried and convicted on all three counts.
 
 
 2
 Scruggs and Lewis appeal their convictions, asserting that the district court's characterization of Lewis' testimony as "evasive" and the court's leading questions to a government witness deprived them of a fair trial. In addition, Scruggs asserts (i) that there was insufficient evidence to establish that he acted with specific intent, (ii) that the count charging him with filing a false tax return was impermissibly vague, and (iii) that his conviction for making false statements must be reversed under the "exculpatory no" doctrine. Because we find no abuse of discretion or error of law by the district court, we affirm.
 
 I.
 
 3
 The convictions of Lewis, Scruggs, Flanders, and Myers stem from their involvement in an organization known as American Family Experience (AFE). This organization sold church charters for the purpose of obtaining tax deductions. Flanders was the founder of the organization, Scruggs was a salesman, Myers was the membership director, and Lewis, an attorney, gave tax advice and prepared members' tax returns.
 
 
 4
 The Assembly of Believers Convention of Churches, which later became AFE, was established by Flanders in 1978. It purported to be the east coast representative of the Universal Life Church (ULC) of Modesto, California, a tax-exempt organizaton. AFE solicited individuals by telling them that upon becoming members of AFE, they could establish a tax-exempt "congregation" of the ULC in their home. The individual would become the "minister" of that congregation and his family its "members." Each congregation would establish its own bank account, from which the minister could receive a "charitable contribution" deduction for any funds he donated to the church. The church would then be entitled to use these donated funds to pay the expenses of the minister and his congregation, i.e., his family. By passing money through this church account, members were advised that they could reduce their tax liability.
 
 
 5
 Upon joining the AFE, an individual received a package of materials that included documents for establishing a church, electing a board of directors, and opening bank accounts. The organization also assisted members in keeping records of their church activities and filing tax returns. Appellant Lewis reviewed these records, rendered advice, and prepared tax returns for some members. Members were told they could spend congregation funds for anything except food and servants, provided the expenditures were approved by the church's board of directors, i.e., the individual's family.
 
 
 6
 The AFE purchased newspaper advertisements promoting itself as a tax shelter and inviting interested persons to attend informational meetings where they could learn about AFE. During 1979, Flanders and Scruggs spoke at several of these meetings. On one of these occasions, Scruggs, in tape recorded remarks played for the jury, stated that he joined AFE "strictly as a tax dodge."
 
 
 7
 In addition to promoting AFE, Lewis and Scruggs established their own church congregations. Both established church bank accounts, took deductions for the amounts transferred into them, and spent money from these accounts for purely personal expenses. On their 1980 returns, Lewis and Scruggs claimed deductions of $8,651 and $15,175, respectively, for amounts transferred into their church accounts. Also, Scruggs earned a commission for every new member he solicited, and Lewis received legal fees from AFE. Both failed to report any of this income.
 
 
 8
 In 1982, W. Thomas Miller, a revenue agent with the IRS, was involved in a program auditing tax protestors in the Northern Virginia area.[1] In May 1982, Miller met with Scruggs to audit Scruggs' 1979 and 1980 income tax returns. During the course of the audit Miller asked Scruggs a series of questions, including whether Scruggs had received any nontaxable income during those years, and whether he had received taxable income which was not reported on the returns. Scruggs responded "no" to these questions. Miller met with Scruggs on two other occasions, and in their last meeting, he told Scruggs and his wife that there were approximately $18,000 in questionable bank deposits. The Scruggs' could not explain the majority of the deposits. In November 1982, Agent Miller referred the Scruggs case to the IRS criminal division. Scruggs, Lewis, Flanders and Myers were subsequently indicted.
 
 II.
 A. Lewis and Scruggs
 
 9
 Lewis and Scruggs jointly assert that the district court's characterization of Lewis as "evasive," made in the presence of the jury during the government's examination, deprived them of a fair trial. This assertion is without merit. The trial judge has broad discretion in conducting and controlling the trial.[2] There is no evidence that the trial court abused its discretion. On the contrary, the record reflects that the trial court exhibited patience throughout Lewis' testimony. During the course of his testimony, Lewis often gave irrelevant, evasive answers to direct questions. Lewis' ramblings included a discussion of the central highlands of Vietnam, which he described as "a central canopy jungle," and an explanation to the jury of the meaning and purpose of a "string citation." The court simply asked Lewis to answer directly the questions posed to him.
 
 
 10
 The context of the judge's remark confirms the absence of any abuse of discretion. Lewis was asked whether his review of the records of AFE members showed that those persons were taking deductions for monies deposited into so-called church bank accounts they controlled. Lewis first asked the government to direct him to a specific exhibit, and then answered nonresponsively that church records would not have shown the identity of the persons receiving payment from those accounts. When asked again whether he knew that people were claiming deductions for money deposited into church bank accounts they controlled, Lewis responded:
 
 
 11
 When you say did I know it, do you mean do I know it in a manner that I could testify from my own personal knowledge that they had either told me they were putting money in it or I had seen it, or did you mean did I presume it, because that is the way the operation was supposed to work? What is the meaning of your term "to know," sir?
 
 
 12
 The court then directed Lewis to answer the questions directly and not evasively.
 
 
 13
 You are trying to be evasive and you are being evasive. Now you will listen to the question and answer it directly.
 
 
 14
 We find that the district court's comments, in context, were proper, and not an abuse of discretion.[3]
 
 
 15
 Appellants' authorities are inapposite. They concern judicial comments on the witness' veracity, not a comment on a witness' refusal to answer questions directly. See, e.g., Quercia v. United States, 289 U.S. 466, 472 (1933) (trial court stated that when the witness wiped his hands it meant he was lying); United States v. Bates, 468 F.2d 1252, 1255 (5th Cir.1972) (trial court directed that witness be charged with perjury where witness testified favorably to the defense in the morning, then recanted and testified favorably to the prosecution in the afternoon). Here, the trial court did not indicate to the jury that Lewis was lying or that he was not credible. Rather, the trial judge merely sought to avoid needless consumption of time by admonishing Lewis to answer questions directly. Even assuming the comment bore on Lewis' credibility, the court gave two curative instructions, one immediately after the court's comment and another at the end of the case. These cured any prejudice to appellants. United States v. Tello, 707 F.2d 85, 88-89 (4th Cir.1983); United States v. Billups, 692 F.2d 320, 327 (4th Cir.1982), cert. denied, 464 U.S. 820 (1983).
 
 
 16
 Appellants also claim that the district court's leading question to a single prosecution witness was plain error and deprived them of a fair trial. This claim, too, is meritless. The witness, Arthur Stickley, testified that Scruggs induced him to join the ULC. On cross-examination, Stickley stated that neither he nor Scruggs intended to break the law:
 
 
 17
 Q: [counsel for Scruggs] You never intended to violate the law by joining the Universal Life Church, did you?
 
 
 18
 A: No.
 
 
 19
 Q: You don't have any reason to think that Bob Scruggs ever intended to violate the law, did you?
 
 
 20
 A: No.
 
 
 21
 After cross-examination, but prior to the government's redirect, the court asked the leading question at issue:
 
 
 22
 The court: Mr. Stickley, you say you didn't intend to violate the law. Didn't this seem to be a little to good for you?
 
 
 23
 A: How do you mean, your Honor?
 
 
 24
 The court: Getting charitable tax deductions when they didn't go to charity?
 
 
 25
 A: Well, that wasn't my intent to violate the law. The way it was presented to me, that this was a legal loophole that you could form a family church and be the recipient on both ends, both as a taxpayer and also as a family church unit.
 
 
 26
 The court: That didn't strike you at all as at least amiss?
 
 
 27
 A: Well, yes, it did. I never felt comfortable with it. But I guess I didn't feel that uncomfortable not to do it.
 
 
 28
 The court: You may step down.
 
 
 29
 This line of questioning by the court was neither an abuse of discretion, nor unfairly prejudicial to appellants.[4] The authorities cited by appellants are inapposite; they do not involve a judge's isolated attempt to clarify an ambiguity. See, e.g., United States v. Bland, 697 F.2d 262, 264-66 (8th Cir.1983) (trial court initiated detailed cross-examination of defendant and defense witness); United States v. Cole, 491 F.2d 1276, 1278-79 (4th Cir.1974) (court found that repeated intrusions by the district judge "tended to portray the defense attorneys as evasive and hypertechnical"). The court's questions here are not an example of repeated, extensive intrusions by the court which substantially assisted the prosecution. Cf. Bland, 697 F.2d at 265-66 ("A trial judge's isolated questioning to clarify ambiguities is one thing; however a trial judge cannot assume the role of an advocate...."). In any event, the jury was instructed that they were the sole judges of the credibility of the witnesses, and that they should disregard the statements of the court in this respect. These instructions were sufficient to cure any error. See Billups, 692 F.2d at 327.
 
 B. Scruggs
 
 30
 Scruggs asserts that there was insufficient evidence presented to establish that he acted with a specific intent to violate the law. In deciding this issue, we must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Hughes, 716 F.2d 234, 239 (4th Cir.1983) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original). In addition, we must consider "circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982) (citation omitted). Here, there was abundant evidence presented to establish the requisite specific intent. Specifically, the evidence consisted of (i) a tape recording in which Scruggs stated that he joined AFE "strictly as a tax dodge," (ii) facts that Scruggs joined the organization at about the same time he was experiencing financial difficulties, (iii) a statement by Scruggs' accountant who told him that the church scheme was something that Flip Wilson might have devised, and (iv) Scruggs' continued practice of claiming charitable deductions even after being notified by the IRS in 1980 that it was disallowing Scruggs' charitable deductions claimed in 1978. Clearly, this evidence amply supported the jury's finding of specific intent.
 
 
 31
 Scruggs also asserts that the count which charged him with filing a false tax return was unconstitutionally vague because it failed to particularize (i) who received the allegedly unreported income, (ii) the source of the income, and (iii) the legal theory for challenging the claimed contribution deductions. We reject this assertion. Sufficiency of the indictment "must be measured by determining whether the charging allegations contain the elements of the crime alleged and whether they sufficiently inform the defendant as to what he must be prepared to meet...." United States v. Buckner, 610 F.2d 570, 573 (9th Cir.1979) (citations omitted), cert. denied, 445 U.S. 961 (1980). Count V of the indictment, the false return count, set forth sufficient allegations to apprise Scruggs of the charges against him.[5] In addition to Count V, Count I (the conspiracy count) sets forth extensive allegations, spelling out in abundant detail the theory upon which the government intended to proceed. Moreover, in response to Scruggs' Motion for a Bill of Particulars, the government volunteered the source of the unreported income, identified the discovery materials recording the precise checks received but unreported by Scruggs and his wife, and explained the legal theory upon which Scruggs' claimed deductions were attacked. The district court correctly found the government's response adequate.
 
 
 32
 Finally, Scruggs asserts that his conviction on Count XV, the false statements charge, must be reversed under the "exculpatory no" doctrine. Here again, Scruggs' claim fails. The false statement charge is predicated upon 18 U.S.C. Sec. 1001, which has been broadly interpreted to cover all false statements made to any branch of the federal government. See Bryson v. United States, 396 U.S. 64 (1969). The "exculpatory no" doctrine is a narrow, judicially created exception to Sec. 1001, holding that a defendant's mere negative responses to questions propounded by an investigating agent during a meeting not initiated by the defendant cannot be prosecuted under Sec. 1001. Paternostro v. United States, 311 F.2d 298, 305 (5th Cir.1962). At the time of oral argument, this Circuit had not ruled on whether to adopt the doctrine. See United States v. Cole, 622 F.2d 98, 100 n. 2 (4th Cir.), cert. denied, 449 U.S. 956 (1980). Since then, however, a panel of this Court, by a majority, has adopted the doctrine. United States v. Cogdell, No. 87-5050 (4th Cir. Apr. 15, 1988).
 
 
 33
 In Cogdell, appellant cashed her income tax refund check, complained to the IRS that she never received the check, then applied for and received a replacement check. After issuing the replacement check, the IRS referred the matter to the Secret Service for investigation. The Secret Service agent assigned to the case interviewed the manager of the store where the original check was cashed, compared the endorsements on the checks, then questioned appellant at her home, advising her that he believed she cashed the original check. It was during this questioning that appellant made the exculpatory statements.[6] Cogdell, slip op. at 2-4. On the basis of these statements, appellant was convicted of making false statements in violation of 18 U.S.C. Sec. 1001. The panel there, however, adopted the exculpatory no doctrine and reversed appellant's conviction. In so doing, the Cogdell panel held that a false statement does not violate section 1001 when:
 
 
 34
 (1) it was not made in pursuit of a claim to a privilege or a claim against the government;
 
 
 35
 (2) it was made in response to inquiries initiated by a federal agency or department;
 
 
 36
 (3) it did not pervert the basic functions entrusted by law to the agency;
 
 
 37
 (4) it was made in the context of an investigation rather than a routine exercise of administrative responsibility;
 
 
 38
 (5) it was made in a situation in which a truthful answer would have incriminated the declarant.
 
 
 39
 Cogdell, slip op. at 11 (citing United States v. Medina De Perez, 799 F.2d 540, 544 (9th Cir.1986).
 
 
 40
 Cogdell, though, is inapposite. There, appellant was the subject of a criminal investigation conducted by the Secret Service.[7] Here, Scruggs' audit interview was administrative in nature rather than investigative, and conducted by a civil, not a criminal, IRS agent. The doctrine is inapplicable in such contexts. See United States v. Morris, 741 F.2d 188, 191 (8th Cir.1984) (questioning in a civil audit interview was "merely a routine administrative inquiry").
 
 
 41
 Having found no abuse of discretion or error of law by the district court, we affirm.
 
 
 
 [1]
 Miller audited approximately 100-150 returns in the course of participating in this program
 
 
 [2]
 Rule 611(a) of the Federal Rules of Evidence provides:
 The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
 It has been noted that "[w]hen a judge exercises his discretionary power under Rule 611(a), his decision will be overturned only if an appellate court finds an abuse of discretion, which as a practical matter is quite rare." 2 G. Joseph & S. Saltzburg, Evidence in America ch. 45 (Michie 1987); see also Fed.R.Evid. 614(b) (permitting interrogation of witnesses by the court).
 
 
 [3]
 It is clear that the district court has the power to interrogate and admonish witnesses, including a criminal defendant. See United States v. Billups, 692 F.2d 320, 326 (4th Cir.1982), cert. denied, 464 U.S. 820 (1983)
 
 
 [4]
 We note that appellants did not object to the court's question until the following day. Objections to the interrogation of a witness by the court should be made at the time of the questioning or at the next available opportunity when the jury is not present. See Fed.R.Evid. 614(c). Appellants thus waived any objection on appeal. United States v. Billups, 692 F.2d 320, 327 (4th Cir.1982), cert. denied, 464 U.S. 820 (1983)
 
 
 [5]
 Count V alleges that Scruggs made and filed a joint tax return for 1980, reporting a joint gross income in the amount of $48,384.43 and claiming a charitable contribution deduction in the amount of $15,175, when Scruggs knew that he received income substantially greater than the amount reported and was entitled to a charitable contribution deduction less than the amount claimed
 
 
 [6]
 Appellant was arrested, read her Miranda rights, and questioned again. Here, too, appellant denied receiving or cashing the original check
 
 
 [7]
 The Cogdell panel recognized that the fourth requirement, i.e., that the statement be made in the context of an investigation rather than a routine exercise of administrative responsibility, "touches the core of the reason for the 'exculpatory no' exception. False statements that pervert an agency's routine administrative functions are the specific target Congress intended the statute to reach, while the exception was created to protect negative responses to interrogation by a criminal investigator." Cogdell, slip op. at 14 (citations omitted)