

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-1997

# United States v. Ruedas

Precedential or Non-Precedential:

Docket 95-5554,95-5601,96-5160,96-5161,96-5162,96-5163

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"United States v. Ruedas" (1997). *1997 Decisions.* Paper 184.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/184

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled July 30, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 95-5554, 95-5601, 96-5160,
96-5161, 96-5162 and 96-5163

UNITED STATES OF AMERICA

v.

MILTON PALMA-RUEDAS

Appellant No. 95-5554.

UNITED STATES OF AMERICA

v.

JORGE LUIS PACHECO

Appellant No. 95-5601.

UNITED STATES OF AMERICA

v.

OMAR TORRES-MONTALVO

Appellant No. 96-5160.

UNITED STATES OF AMERICA

v.

JAIRO PEDROZA-ORTIZ

Appellant No. 96-5161.

UNITED STATES OF AMERICA

v.

RANDY ALVAREZ-QUINONES

Appellant No. 96-5162.

UNITED STATES OF AMERICA

v.

JACINTO RODRIGUEZ-MORENO, a/k/a Joel Moreno,
Joel Moreno-Llanos, Arturo Torres Celorio

Jacinto Rodriguez-Moreno,

Appellant No. 96-5163.

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Criminal Nos. 95-cr-00070-3, 95-cr-00070-2,
95-cr-00070-1, 95-cr-00070-4, 95-cr-00070-5 and
95-cr-00070-6)

ARGUED NOVEMBER 12, 1996

BEFORE: ALITO, ROTH and LEWIS, Circuit Judges.

(Filed July 30, 1997)

Camille M. Kenny (ARGUED)
Fleming, Roth & Fettweis
744 Broad Street, Suite 701
Newark, NJ 07102

Attorney for Appellant,
Milton Palma-Ruedas

Jerome A. Ballarotto
143 Whitehorse Avenue
Trenton, NJ 08610

Attorney for Appellant,
Jorge Luis Pacheco

Mark W. Catanzaro (ARGUED)
513 South Lenola Road
Blason IV, Suite 208
Moorestown, NJ 08057

Attorney for Appellant,
Omar Torres-Montalvo

Dennis A. Durkin
Robert S. Cosgrove
Durkin & Durkin
P.O. Box 1289
West Caldwell, NJ 07007-1289

Attorney for Appellant,
Jairo Pedroza-Ortiz

Daniel A. Greenstone
Greenstone & Greenstone
401 Hackensack Avenue
Hackensack, NJ 07601

Attorney for Appellant,
Randy Alvarez-Quinones

John P. McDonald
McDonald, Rogers & Rizzolo
181 West High Street
Somerville, NJ 08876

Attorney for Appellant,
Jacinto Rodriguez-Moreno

Kevin McNulty
Office of United States Attorney
970 Broad Street, Room 502
Newark, NJ 07102

George S. Leone (ARGUED)
Office of United States Attorney
4th and Cooper Streets
Mitchell H. Cohen Courthouse
One John F. Gerry Plaza
Camden, NJ 08101

 Attorneys for Appellee

**OPINION OF THE COURT**

LEWIS, Circuit Judge.

Defendants –– Omar Torres-Montalvo ("Montalvo"), Jorge Luis Pacheco ("Pacheco"), Randy Alvarez-Quinones ("Quinones"), Milton Palma-Ruedas ("Palma-Ruedas"), Jairo Pedroza-Ortiz ("Ortiz"), and Jacinto Rodriguez-Moreno ("Moreno") –– appeal their convictions on charges arising from a drug conspiracy and kidnapping scheme. All six defendants were convicted by a jury in the United States District Court for the District of New Jersey of kidnapping and conspiracy to kidnap, in violation of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 1201(c). Montalvo, Pacheco, and Quinones were also convicted of conspiracy to distribute and possess cocaine, in violation of 21 U.S.C. § 846. In addition, Moreno was convicted of using and carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1). In this consolidated appeal, defendants challenge their convictions on numerous grounds. We will discuss each of these challenges in turn, focusing in more detail on Moreno's claim that venue in New Jersey was improper to try the § 924(c)(1) count.

We will conclude that venue was improper in New Jersey and, accordingly, we will reverse Moreno's conviction under

4

18 U.S.C. § 924(c)(1). We will affirm the defendants' convictions on all other counts.

## I.

Defendant Montalvo ran a cocaine distribution enterprise out of Texas. In July of 1994, Ephrain Avendano ("Avendano"), the kidnapping victim, introduced Montalvo to Fanol Ochoa ("Ochoa"), a New York drug dealer, so that Montalvo and Ochoa could discuss a possible cocaine transaction. Thereafter, Avendano served as the middleman between Montalvo and Ochoa.

In October of 1994, Montalvo and another defendant, Pacheco, arranged to sell Ochoa fourteen kilograms of cocaine. Avendano acted as the middleman in this deal. Montalvo hired Raul Lopez ("Lopez"), who later became a key witness for the government, and another friend to "do the run" from Texas to New York because Lopez owned a car with a secret compartment. On October 29, 1994, while en route to New York, Lopez was arrested and the fourteen kilos of cocaine were seized. Montalvo called Avendano to let him know that the deal had been thwarted and that he had hired lawyers to represent Lopez.

In November of 1994, Montalvo and his cousin, Defendant Quinones, met with Avendano. Montalvo told Avendano that the seizure of the fourteen kilos and the legal fees were "a big loss" and that he needed to make a new deal to compensate for it. Avendano conveyed this information to Ochoa, who agreed to strike another deal with Montalvo for twenty kilograms of cocaine. Avendano, again acting as the middleman, agreed to fly to Houston and help Ochoa execute the deal with Montalvo. Avendano arrived in Houston on December 11, 1994, and was met at the airport by Ochoa and another man named "Baldy." Ochoa told Avendano that the deal had been increased to thirty kilograms of cocaine and that Montalvo had agreed to give Ochoa the extra ten kilograms on credit. Ochoa then informed Avendano of the plan to get the cocaine from Montalvo: Avendano and Baldy were to meet Montalvo, Baldy would put the cocaine in his car, and Avendano would call Ochoa, who would then deliver the money.

Ochoa explained that he was not meeting Montalvo personally because of "reasons of security."

Pursuant to this plan, Montalvo and Pacheco met Avendano and Baldy. Baldy instructed Montalvo and Pacheco to place the thirty kilos of cocaine in a suitcase, and Baldy drove away with the drugs. When Avendano tried to execute the last phase of the deal -- to call Ochoa to secure payment for Montalvo -- Ochoa did not answer his pager.

Obviously, Montalvo was not happy about being taken advantage of by Ochoa for the price of the drugs, which was nearly half-a-million dollars. And, in response, Montalvo and Pacheco informed Avendano that he was "responsible" for the money, warning him that they may have to turn him over to the "Medellin people."

On December 12, 1994, Montalvo called Avendano's wife, Marbel Avendano, and told her that he was holding Mr. Avendano. Montalvo informed Mrs. Avendano that he could not let Mr. Avendano go until he found Ochoa because Avendano was "his only guarantee." Montalvo and Pacheco then moved Avendano to an apartment in Houston and then to a house. Avendano was kept in the house for two weeks. Montalvo was armed at all times.

After hearing that Ochoa was in New York boasting about how he had "ripped-off " Montalvo, Montalvo forced Avendano to disclose the address of his mother and cousin in Columbia and the address of his home in New Jersey. Montalvo then informed Avendano that they were all going to travel to Avendano's home in New Jersey to continue the search for Ochoa. Montalvo warned Avendano not to try anything "because it could work out worse for him."

That same day, Pacheco showed up at the apartment with three men, Defendants Ortiz, Palma-Ruedas, and Moreno, who had been hired to help look for Ochoa and keep Avendano captive. Ortiz, Palma-Ruedas, and Moreno travelled with Pacheco, Montalvo, and Avendano from Texas to New Jersey. They arrived in New Jersey at Avendano's apartment on December 28, 1994. Using Avendano's apartment as a home base, the defendants spent the next few days looking for Ochoa.

On January 1, 1994, they all went to Quinones's house in Newburgh, New York. Mrs. Avendano stayed at the Avendanos' apartment in New Jersey. Both Mr. Avendano and Mrs. Avendano testified at trial that at this point they thought they would never see each other again.

Before Avendano arrived with Pacheco at Quinones's house, Montalvo had decided that the house was not safe because police had inquired about the car with Texas plates in the driveway. Montalvo then informed the group that they were going to travel to Maryland that night. As they got ready to leave, Montalvo told Avendano to carry the guns so that if they were pulled over on the way, Avendano would be responsible for the guns.

Montalvo, Pacheco, and Avendano travelled in one car, and Ortiz, Palma-Ruedas, Moreno, and Quinones travelled in another. Early in the morning on January 2, 1995, they all arrived at a house in Maryland owned by Mr. Morillo. Soon after their arrival in Maryland, Morillo showed off his .357 magnum revolver to the men. Meanwhile, Montalvo continued his search for Ochoa from the house in Maryland. Once it became clear that Montalvo's search for Ochoa was fruitless, tensions among the men began to run high. At one point, Moreno told Montalvo that they "were just wasting time" and that they should "just get it over with and kill Avendano." Moreno then put Morillo's .357 magnum to the back of Avendano's neck, making it clear that he was going to kill him. Shortly thereafter, Avendano was able to escape from the rear of the house.

Avendano ran to a neighbor's house, where he frantically begged the neighbor in broken English to let him use the phone. Avendano called his wife in New Jersey, and his wife got on the phone with the neighbor and asked him to call the police because her husband was in danger. Mrs. Avendano also called the police in New Jersey.

When the police arrived at the neighbor's house, Avendano related the story of his kidnapping to the police. Meanwhile, back in New Jersey, the police had also shown up at the Avendanos' apartment with the FBI. The Maryland police were able to corroborate Avendano's story with the police in New Jersey. The Maryland police put the

7

Maryland house under surveillance, secured a search warrant, and entered the house. All six defendants were arrested, and the police seized the .357 magnum with Moreno's fingerprints on it, Montalvo's pager, Montalvo's cell phone, a faxed photograph of Ochoa, and papers bearing the telephone numbers of Avendano's and Ochoa's beepers.

All six defendants were indicted for: (1) kidnapping Avendano; (2) conspiring to kidnap Avendano and his wife; and (3) conspiring to distribute and possess with intent to distribute cocaine. All defendants except Quinones were indicted for kidnapping Mrs. Avendano. In addition, Moreno was indicted for using and carrying a firearm in relation to a crime of violence.

The defendants were jointly tried by jury in the United States District Court for the District of New Jersey. At the conclusion of the government's case, Palma-Ruedas, Ortiz, and Moreno moved to dismiss the drug conspiracy charges against them pursuant to Rule 29 of the Federal Rules of Criminal Procedure.[1] The district court granted their Rule 29 motion, finding that the government had failed to prove that Palma-Ruedas, Ortiz, and Moreno had intended to join a cocaine distribution conspiracy. J.App. at 470. The jury found the defendants guilty of all remaining counts.[2]

_____

1. Rule 29(a) provides, in pertinent part:

The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Fed. R. Crim. P. 29(a).

2. Montalvo was sentenced to life imprisonment on four counts to be served concurrently. Pacheco was sentenced to 292-months imprisonment on four counts to be served concurrently. Quinones was sentenced to 151-months imprisonment on three counts to be served concurrently. Palma-Ruedas was sentenced to 135-months imprisonment on three counts to be served concurrently. Ortiz was sentenced to 96-months imprisonment on three counts to be served concurrently. Moreno was sentenced to 87-months imprisonment on three counts to be served concurrently and 60-months imprisonment on the § 924(c)(1) count to be served consecutively.

8

All six defendants appealed, and we consolidated their appeals. The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.

**II.**

**A. <u>Venue</u>**

Defendant Moreno was indicted and convicted of violating 18 U.S.C. § 924(c)(1). That section provides:

Whoever, during and in relation to any crime of violence or drug trafficking crime . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years . . . .

18 U.S.C. § 924(c)(1).

At the conclusion of the government's case, Moreno moved to dismiss the § 924(c)(1) count for lack of venue. Moreno argued that because the evidence conclusively established that he had neither "used" nor "carried" the .357 magnum revolver outside of Maryland, venue could only properly lie in Maryland. The government conceded that Moreno had only used or carried the gun in Maryland but maintained that venue in New Jersey was proper nonetheless. According to the government, venue was proper in New Jersey for the gun charge because venue in New Jersey was proper for the predicate offense of kidnapping.

Having no guidance from this Circuit on the venue issue, the district court was forced to choose between two opposing analyses offered, respectively, by the Ninth Circuit and the Fifth Circuit. <u>Compare United States v. Corona</u>, 34 F.3d 876, 879 (9th Cir. 1994) (holding that Nevada was improper venue for trying defendant on § 924(c)(1) charge, even though Nevada was proper venue for trying defendant on underlying drug conspiracy, when defendant never actually used or carried the firearm in Nevada), <u>with United States v. Pomranz</u>, 43 F.3d 156 (5th Cir. 1995) (holding that defendant was properly tried for unlawful use of a firearm

during drug trafficking offense in any district in which venue was proper for underlying drug distribution conspiracy). Apparently persuaded by the Fifth Circuit's decision in Pomranz, the district court concluded that Moreno could properly be tried in New Jersey for violation of 18 U.S.C. § 924(c)(1). See J.App. at 468.

Moreno's appeal requires us to address, for the first time, whether the Constitution requires a defendant to be tried under § 924(c)(1) in the venue where the violation of that statute took place. Or, to state the issue differently, can the government try a defendant for using or carrying a firearm in any venue where it may try the related crime when the defendant neither carried nor used the firearm in that venue? Because the district court's decision regarding proper venue was an interpretation of law, we have plenary review. United States v. Baxter, 884 F.2d 734, 735 (3d Cir. 1989).

Article III, Section II of the Constitution states in pertinent part: "The Trial of all Crimes, except in Cases of Impeachment, shall be . . . held in the State where the said crimes shall have been committed . . . ." U.S. Const. art. III, § 2. Thus, by its explicit terms, the Constitution requires crimes to be tried where they are committed.[3]

Moreover, we have emphasized that proper venue is not just a mere formal requirement but, rather, a right of

_____

3. This requirement is reinforced by the vicinage provision of the Sixth Amendment, which provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . .

U.S. Const. amend VI. (emphasis added). See United States v. Anderson, 328 U.S. 699, 703 (1946).

In addition, Rule 18 of the Federal Rules of Criminal Procedure provides:

Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed.

Fed. R. Crim. Proc. 18 (emphasis added).

constitutional dimension. See United States v. Baxter, 884 F.2d 734, 736 (3d Cir. 1989) ("[p]roper venue in criminal trials is more than just a procedural requirement; it is a safeguard guaranteed twice by the United States Constitution itself."); see also United States v. Goldberg, 830 F.2d 459, 465 (3d Cir. 1987) ("The venue provisions of the Constitution are important safeguards, protecting an accused from unfairness and hardship in defending against prosecution by the federal government.").

The government urges us to disregard these constitutional dictates and adopt the approach of the Fifth Circuit in Pomranz. Moreno urges us to adopt the approach of the Ninth Circuit in Corona. Because Corona and Pomranz elucidate the parameters of this issue, we will discuss those cases in some detail.

In United States v. Corona, 34 F.3d 876, 879 (9th Cir. 1994), the Ninth Circuit reversed the conviction of the appellant for the unlawful use of a firearm in violation of § 924(c)(1) because of improper venue. Adopting a "key verbs" test, which examines the verbs in the statute that define the criminal conduct to determine where the offense was committed, the court held that Nevada was not the proper venue for the substantive crimes arising from the conspiracy -- distribution of cocaine and use of a firearm during drug trafficking -- which occurred entirely in California. Id. at 880. Because the defendant had not distributed cocaine nor used a firearm in Nevada, venue was improper, even though the conspiracy counts were properly tried in Nevada.

In United States v. Pomranz, 43 F.3d 156 (5th Cir.), cert. denied, 116 S. Ct. 513 (1995), the Fifth Circuit explicitly rejected the Ninth Circuit's analysis. The Fifth Circuit noted that the Ninth Circuit's approach would "effectively undermine the Congressional intent to curb the violence inherently associated with high level drug deals." Pomranz, 43 F.3d at 161. Because a violation of § 924(c)(1) is necessarily intertwined with the predicate act of drug trafficking or committing a violent crime, the Fifth Circuit concluded that § 924(c)(1) violations can be properly tried in the same venue as the underlying drug or violent crime offense. Id. In reaching this conclusion, the court relied

11

heavily on policy concerns -- that the government would
have to "expend its limited resources in prosecuting a felon
a second time for this separate offense, or satisfy itself with
the punishment previously imposed and forfeit a conviction
on the weapons count." Id. at 161. Further, in addressing
the obvious constitutional concerns inherent in its decision
to allow venue, the court stated: "[W]e do not believe that
our holding seriously infringes on the defendant's rights
since this Court treats the right to venue with less
deference than other constitutional rights." Id. at 162.

Thus, while the Ninth Circuit, relying heavily on the
literal language of the Constitution and Rule 18 of the
Federal Rules of Criminal Procedure, found the rights
guaranteed by these provisions to outweigh concerns about
judicial economy, the Fifth Circuit adopted a more
pragmatic approach. The Ninth Circuit stated the tension
between the two approaches this way:

What the government is essentially arguing for is a rule
of law allowing venue over a substantive crime
committed in furtherance of a conspiracy in any
district where venue is proper for the conspiracy
charge. While such a rule might make some sense from
a policy standpoint, it runs counter to the venue
principles established by the Constitution, the Federal
Rules of Criminal Procedure, and the federal courts.

Corona, 34 F.3d at 879.

Relying heavily on the rationale articulated in Pomranz,
the government advances two arguments for finding venue
proper in this case. First, the government urges us to
consider the cost of forcing duplicative trials. Had the
government been forced to try Moreno on the gun charge in
Maryland, it contends, its resources would have been
dramatically strained because it would have also had to
retry Moreno on the underlying predicate offense of
kidnapping.

The government's second and related argument is that
when determining venue, a court must look closely to "the
nature" of § 924(c)(1). In other words, because a violation of
§ 924(c)(1) is dependent on the predicate offense -- in this

12

case, kidnapping -- it would be illogical to require the
§ 924(c)(1) offense to be tried in a different venue.

We reject both of the government's arguments. Instead,
we agree with the Ninth Circuit that to determine where
venue should lie under § 924(c)(1) the "verb test" is the
proper test.4 Applying that test here, we find that § 924(c)(1)
unambiguously designates the criminal conduct that is
prohibited as "using" or "carrying" afirearm. It follows that
one "commits" a violation of § 924(c)(1) in the district where
one "uses" or "carries" a firearm. Accordingly, we conclude
that because the crime committed by Moreno -- carrying or
using a firearm in relation to a crime of violence -- occurred
only in Maryland, Moreno could only have been properly
tried in Maryland.

Contrary to the government's assertions, application of
the verb test here would not cause it undue hardship. For
example, our holding would not prevent the government
from trying the predicate offense in any venue in which the
§ 924(c)(1) charge would be properly brought. Indeed, had

_____

4. For a discussion of the "verb test," see Armistead M. Dobie, Venue in
Criminal Cases in the United States District Court, 12 Va. L. Rev. 287,
289 (1926) ("All federal crimes are statutory, and these crimes are often
defined . . . in terms of a single verb. That essential verb usually
contains the key to the solution of the question: In what district was the
crime committed?"). See generally United States v. Georgacarakos, 988
F.2d 1289, 1293 (1st Cir. 1993) ("To determine venue, we examine `the
key verbs in the statute defining the criminal offense' to find the scope
of the relevant conduct.")(quoting United States v. Tedesco, 635 F.2d
902, 905 (1st Cir. 1980)); United States v. Donahue, 885 F.2d 45, 49 (3d
Cir. 1989) ("[I]t is often helpful to look at the statutory verb in the
description of the offense in determining where an offense was
committed."); United States v. Cofield, 11 F.3d 413, 416 (4th Cir. 1994)
(noting that "we have adopted the `verb test' as an interpretative aid");
United States v. Murphy, ___ F.3d ___, 1997 WL 349887, at *2 (4th Cir.
June 26, 1997) ("Where . . . Congress has not provided an express venue
provision in conjunction with a criminal offense, this circuit has looked
to the verbs defining the criminal offense and the purpose underlying the
criminal statute to determine proper venue."); United States v. Crawford,
___ F.3d ___, 1997 WL 339295, * 7 (8th Cir. June 23, 1997) (applying the
"active verb" or "key verb" test to the Child Support Recovery Act); United
States v. Ryan, 894 F.2d 355, 360 (10th Cir. 1990) ("Courts usually
examine the verbs employed in the statute to define the offense.").

the government wanted to try Moreno on all counts in a
single trial, it certainly could have done so in Maryland.5
Thus, the government overstates the potential hardship it
would face if forced to try § 924(c)(1) violations in the venue
where the gun was used or carried. Essentially, the
government wants to have the option of venue-- that is, it

does not want to be <u>restricted</u> to trying these cases in the venue where the § 924 violation occurred.

Many constitutional guarantees for criminal defendants are inefficient and costly -- the right to counsel comes to mind. Nevertheless, these guarantees form the bedrock principles of our criminal justice system and should not be hastily balanced away. <u>See</u> <u>United States v. Johnson</u>, 323 U.S. 273, 276 (1944) ("If an enactment of Congress equally permits the underlying spirit of the constitutional concern for trial in the vicinage to be respected rather than to be disrespected, construction should go in the direction of constitutional policy . . . ."). Thus, here, where the statute does not indicate the location of the crime for purposes of determining venue, we must strictly construe the verbs that define the criminal conduct to ensure that the defendant's Sixth Amendment rights are protected.6

While of course, Congress cannot abrogate the venue guarantee altogether, it can define a crime broadly such that commission of that crime will likely cross state borders. <u>See</u> Charles A. Wright, <u>Federal Practice & Procedure</u> § 302, at 201 (2d ed. 1982). For example, 18

_____

5. The government argues that the count charging Moreno with kidnapping Mrs. Avendano could only have properly been tried in New Jersey or New York, thus precluding a consolidated trial. Because Moreno's violation of § 924(c)(1) was only related to the kidnapping of <u>Mr. Avendano</u>, the fact that he committed a separate crime of kidnapping <u>Mrs. Avendano</u> is not particularly relevant to our venue analysis.

6. The parade of horribles offered by the dissent to demonstrate the inadequacies of the "verb test," while perhaps compelling on its own terms, has no application in the context of this case. Although there may be statutes in which the verbs defining the criminal conduct are ambiguous, 18 U.S.C. § 924(c)(1) is not such a statute. <u>Cf.</u> <u>United States v. Angotti</u>, 105 F.3d 539, 542 (9th Cir. 1997) (noting that the <u>Corona</u> court "quite logically" held that "the crime of distribution of narcotics is committed in the district where the narcotics are distributed").

14

U.S.C. §§ 659 & 660 allow the government to indict an individual for "stealing" from interstate commerce in any district in which the individual "possessed" the proceeds of the theft. See id. Congress can also explicitly provide a venue provision for any given offense, as long as the venue bears some relation to the offense.[7] But where, as here, Congress has not explicitly indicated an intention to allow multiple venue actions, we remain guided by the strict language of the Constitution. See Anderson, 328 U.S. at 703 (holding that when "nothing in either the statute or the legislative history . . . show[s] an intention on the part of Congress to depart from the Sixth Amendment's command," courts must look to the nature of the crime and where it was committed to determine venue); United States v. Barsanti, 943 F.2d 428, 434 (4th Cir. 1991) ("Congress did not expressly provide for venue in 18 U.S.C. § 1001; therefore, we must look to the verbs of the statute for guidance.").

In the specific context of § 924(c), Congress could have drafted the statute to allow venue to lie in any district where the government could properly bring the related crime of violence or drug trafficking offense.[8] Congress did not do so. Without such an explicit expression of congressional intent, we decline the government's invitation to construe liberally the venue requirement.

Because Moreno only used or carried the gun in Maryland and because that conduct constitutes the substantive offense under § 924(c)(1), venue in New Jersey was improper. Accordingly, we reverse Moreno's conviction under § 924(c)(1) for lack of venue.

## B. Rule 404(b) Evidence

Defendants Montalvo, Pacheco, and Quinones argue that

---

7. For example, Congress has provided for continuing offenses to be tried "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). And, murder offenses may be tried in any district "where the injury was inflicted . . . without regard to the place where the death occurs." 18 U.S.C. § 3236.

8. Indeed, the dissent artfully suggests just how such a statute might be written. See Dissent at 33-34.

15

the district court abused its discretion in allowing the admission of "other crimes" evidence of previous drug transactions.[9] Specifically, the defendants attack the admission of testimony from Avendano, the kidnapping victim, and Lopez, the drug courier, regarding the thwarted fourteen-kilo cocaine deal. Defendants also challenge the admission of Lopez's testimony about the five drug transactions that preceded the fourteen-kilo deal. According to defendants, they were prejudiced by the admission of this evidence in violation of Rule 404(b) of the Federal Rules of Evidence, which prohibits the admission of prior bad acts when used to portray a defendant as a "bad person." Because the fourteen-kilo deal was admitted solely to portray the defendants as drug dealers and, thus, "bad people," defendants contend that it was improperly admitted.

Initially, we must determine whether evidence of the prior cocaine transactions was probative of the charged conduct, rather than merely probative of the defendants' character. <u>United States v. Sriyuth</u>, 98 F.3d 739, 745 (3d Cir. 1996).

Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b).

Thus, for "other crimes" evidence to be admitted, it must be logically relevant, under Rules 404(b) and Rule 402, to any issue other than the defendant's propensity to commit the crime, and its probative value must outweigh its

_____

9. Evidence of the prior cocaine transactions was not admitted against Quinones at trial. His argument is better understood as objecting to the district court's refusal to sever his trial from the other defendants. In essence, Quinones claims that his trial should have been severed <u>because</u> evidence of the prior deals was admitted against his co-defendants.

prejudicial effect. <u>United States v. Himelwright</u> , 42 F.3d 777, 781 (3d Cir. 1994). Because trial courts have substantial leeway in making evidentiary rulings, we review a district court's decision to admit 404(b) evidence for abuse of discretion. <u>Id.</u> When, however, a district court does not offer reasons for its evidentiary rulings, we need not defer to the reasoning of the district court. <u>Id.</u>

1. <u>The Fourteen-Kilo Deal</u>.

When the government first sought to introduce the fourteen-kilo cocaine deal, it offered it as part and parcel of the drug conspiracy count of the indictment. According to the government, the original fourteen-kilo deal was part of the charged drug conspiracy because all of the players were identical to the players in the thirty-kilo deal: Montalvo and Pacheco were the sellers; Avendano was the middleman; and Ochoa was the buyer. Under the government's theory, because the first fourteen-kilo deal was thwarted when the courier, Lopez, was arrested by police, Montalvo was eager to "up the ante" on the next deal.

The district court, however, expressed unwillingness to consider the fourteen-kilo deal as part of the same conspiracy as the subsequent thirty-kilo deal because the indictment only charged a conspiracy to distribute thirty kilos of cocaine. Instead, the district court urged the government to introduce the fourteen-kilo deal as 404(b) evidence.

Consequently, the government introduced the fourteen-kilo deal, offering the following reasons to explain why it qualified under Rule 404(b):

[I]t provides the background and an explanation of the relationship between Mr. Montalvo, Mr. Pacheco, and Mr. Lopez . . . . There's an overlap in the 14 kilogram transaction because that overlaps to Mr. Ochoa, the guy who stole the 30 kilos in this case, and Avendano, who was intended middleman in the 14 and the 30. It also shows a method of operation. It also shows the planning and preparation in terms of having a car prepared to conceal these drugs. It's sort of a test run, so to speak, Your Honor, to take it for a distance from A to B, which is very short and then follow it up with

17

a matter of days and take it interstate from Houston towards New York.

J.App. at 93-94.

Presumably adopting the government's analysis, the district court admitted the prior drug deal:

I don't have any difficulty with that whatsoever. The probative value of that is not substantially outweighed by the danger of any kind of unfair prejudice. I've ruled on that. Absolutely clear. Classic 404(b).

J.App. at 94.

We can infer that the district court adopted the government's proffered reason for admitting the fourteen-kilo deal as 404(b) evidence. See United States v. Sampson, 980 F.2d 883, 888 (3d Cir. 1992) (stating that a district court's summary conclusion to admit 404(b) evidence may be sufficient if the government thoroughly explains its proffered reason for offering it). We agree that the government has sufficiently shown that the fourteen-kilo deal was a link in a chain of events that led to the charged conduct and not merely evidence that the defendants were more likely than not to have committed the charged conduct. Thus, we conclude that the district court properly determined that the fourteen-kilo cocaine deal qualified as "other crimes" evidence under Rule 404(b).

Unfortunately, it is more difficult to decipher the reasoning of the district court with regard to the balancing analysis required by Rule 403.10 The district court merely stated a conclusion that the probative value of the evidence outweighed its prejudicial effect. Although the district court may have in fact engaged in Rule 403 balancing, it did not articulate on the record a rational explanation. See

_____

10. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

18

Government of Virgin Islands v. Harris, 938 F.2d 401, 420 (1991). Thus, we need not defer to the district court and can conduct the requisite balancing analysis ourselves. Himelwright, 42 F.3d at 781.

In our view, while the fourteen-kilo deal may have had some prejudicial effect on Montalvo and Pacheco, the evidence of the deal was substantially relevant to the government's case against the defendants to outweigh any risk of prejudice. Indeed, the fourteen-kilo deal went to the heart of the government's theory of the case: The government contended that the thirty-kilo deal, which led to the kidnapping, was set up to offset the loss caused by the thwarted fourteen-kilo deal.

In addition, the district court gave explicit limiting instructions to the jury immediately after Lopez's testimony, which described the fourteen-kilo deal.11 This limiting instruction mitigated any potential prejudice against Montalvo and Pacheco. See Sriyuth, 98 F.3d at 748 (recognizing that unfair prejudice can be minimized by a limiting instruction). In other words, the limiting instruction sufficed to enable the jury to compartmentalize the evidence and consider it only for its proper purpose. Id. (citing United States v. Driggs, 823 F.2d 52, 54 (3d Cir. 1987)).

Thus, in our view, the evidence of the fourteen-kilo deal was highly probative to show method of operation and preparation, while the prejudicial effect was minimal. Accordingly, the fourteen-kilo deal was properly admitted as "other crimes" evidence under Rule 404(b).

---

11. Specifically, the court instructed the jury to:

Use this evidence to decide whether or not defendant Montalvo and defendant Pacheco had knowledge of the drug conspiracy charged in the indictment and intended to participate in. Should you choose to believe the evidence of these other cocaine transactions you've heard this afternoon, I caution you, you may only use it for these limited purposes. You may not use it to prove that defendant Montalvo and defendant Pacheco are bad persons or that they were predisposed to do bad things. . . .

J.App. at 281-82.

19

2. The Five Prior Drug Transactions.

The defendants also object to the admission of five prior cocaine deals. The government offered evidence, through the testimony of Lopez, of five prior cocaine transactions purportedly to show Lopez's relationship with Montalvo and Pacheco. In addition, the government contended that Lopez's testimony about the prior deals was probative to rebut Montalvo's and Pacheco's claim of noninvolvement with Lopez. Lopez, however, had absolutely no involvement with the charged drug conspiracy -- that is, the thirty-kilo cocaine deal. The defendants therefore argue that the five prior deals did not relate to anything at issue in the case.

Although it is clear that the district court found the evidence to be "classic 404(b)," it is unclear from the record whether the district court conducted a balancing analysis under Rule 403. J.App. at 94. The district court judge merely stated that: "[T]hat's other crimes evidence. I already told you, I balanced -- I balanced that last night, I certainly couldn't see the fourteen kilos as part of this transaction, but I think it's appropriate other crimes evidence." J.App. at 101. Moreover, the district court discussed the prior five deals as part and parcel of the fourteen-kilo deal, rather than as separate 404(b) evidence. Again, because the district court did not offer reasons for its ruling, we must engage in Rule 403 balancing as to the five prior deals ourselves. See Himelwright, 42 F.3d at 781.

While the evidence of the five prior deals clearly shows a relationship between Montalvo and Pacheco, we question whether that evidence had much probative value because the relationship between Montalvo and Pacheco had already been established by the fourteen-kilo deal. On the other side of the scale, however, the risk of prejudice to the defendants by introducing that evidence was significant. Through its admission, the government may have been able effectively to convey to the jury that Montalvo and Pacheco were career drug dealers and "bad people."

Nevertheless, we find it unlikely that "any prejudice resulting from the admission of [the 404(b) evidence] . . . `cause[d] the jury to base its decision on something other than the established propositions in this case.' " United

20

States v. McGlory, 968 F.2d 309, 339 (3d Cir. 1992) (citing Carter v. Hewitt, 617 F.2d 961, 972 (3d Cir. 1980)). In other words, given that the five prior deals were relatively small scale and that evidence of the fourteen-kilo deal had already been properly admitted, the admission of thefive prior deals likely had no effect on the jury's decision. Accordingly, while we are concerned with the district court's failure to explain its reasons for admitting the five prior cocaine deals, we do not think that the admission of that evidence rises to the level of reversible error.

## C. **Severance**

Moreno, Palma-Ruedas, Ortiz, and Quinones contend that the district court abused its discretion in refusing to sever their trials from the trial of Montalvo and Pacheco. Specifically, Moreno, Palma-Ruedas, Ortiz and Quinones claim that the district court wrongly balanced the prejudice to the defendants against the advantages of joinder.

In reviewing orders denying motions to sever, we look to the record as it existed when the motion was made, what trial developments were then reasonably foreseeable, and in that light decide whether the district court abused its discretion in denying the severance motion. United States v. Sandini, 888 F.2d 300, 305-06 (3d Cir. 1989); United States v. Console, 13 F.3d 641 (3d Cir. 1993).

In general, we favor joint trials for defendants who are indicted together. See Zafiro v. United States , 506 U.S. 534, 537 (1993); United States v. Balter, 91 F.3d 427, 432 (3d Cir. 1996). The defendants acknowledge this preference but, nevertheless, claim that evidence of the drug conspiracy admitted against Montalvo and Pacheco was so overwhelming that it "spilled over" to them.

As the Supreme Court noted in Zafiro, courts should grant a severance motion "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 538-39. Such a risk may occur "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." Id. at 539. According to

21

defendants, that is exactly what happened in this case. That is, Moreno, Palma-Ruedas, Ortiz, and Quinones contend that the jury could not possibly have compartmentalized the drug evidence admitted against Montalvo and Pacheco, even with explicit limiting instructions.

When Moreno, Palma-Ruedas, Ortiz, and Quinones moved to sever, the district court had before it only an indictment charging all six defendants with conspiracy to kidnap and distribute drugs. Thus, when the motion was made, the district court had no reason to believe that Moreno, Palma-Ruedas, Ortiz, and Quinones were situated any differently with respect to the drug conspiracy than Montalvo and Pacheco. Moreno, Palma-Ruedas, Ortiz, and Quinones contend, however, that their severance argument is bolstered, retrospectively, by the fact that, at the conclusion of the government's case, the district court acquitted the defendants of the drug conspiracy charge pursuant to Rule 29. Yet, as the government properly points out, even if these defendants had been tried separately, evidence of the thirty-kilo drug deal would have been admissible against each of them to prove motive for the kidnapping charge. In other words, some evidence relating to a drug transaction -- indeed, the largest transaction -- was relevant to all of the charges and all of the defendants. Thus, we are unpersuaded by the defendants' contention that their trials were "tainted" by the association with drugs.

Moreover, even if we were to find that the district court abused its discretion in denying the severance motion, the defendants must still pinpoint "clear and substantial prejudice," which resulted in an unfair trial. United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991). We are convinced that by instructing the jury that evidence of the prior drug transactions -- specifically, evidence of the fourteen-kilo deal and the five smaller deals-- was to be considered only against Montalvo and Pacheco, the district court took sufficient steps to cure any prejudice caused by admission of that evidence. See Zafiro, 506 U.S. at 539 (noting that "less drastic measures, such as limiting instructions, often will suffice to cure any risk of

22

prejudice"). Accordingly, we conclude that defendants have not shown clear or substantial prejudice as a result of the district court's denial of their severance motion.

## D. **Variance**

Ortiz, Moreno, and Palma-Ruedas argue that their convictions should be vacated because there was a variance between the indictment and the proof at trial, to the prejudice of the their substantial rights. See Kotteakos v. United States, 328 U.S. 750 (1946); United States v. Salmon, 944 F.2d 1106, 1116 (3d Cir. 1991) (noting that under Kotteakos, "a conviction must be vacated where a variance between the indictment and proof at trial exists to the prejudice of a defendant's substantial rights"). Ortiz, Moreno, and Palma-Ruedas contend, through a creative reading of the indictment, that the government actually charged one broad conspiracy but at trial presented proof of multiple conspiracies. Specifically, they contend that there was a variance between the indictment and the proof offered at trial because they were charged with a cocaine conspiracy but convicted of a kidnapping conspiracy. We reject this argument.

The second superseding indictment charged Ortiz, Moreno, and Palma-Ruedas with conspiracy to distribute cocaine and conspiracy to kidnap. J.App. at 20. At trial, the existence of those two conspiracies was proven. While true that Ortiz, Moreno, and Palma-Ruedas were convicted only of the kidnapping conspiracy, the fact that they were acquitted of one of the conspiracies does not establish a prejudicial variance. On the contrary, the defendants were indicted on a kidnapping conspiracy and convicted on a kidnapping conspiracy; thus, there is no variance here.

## E. **Sufficiency of Evidence to Convict Quinones**

Quinones argues that his convictions should be reversed because the evidence against him was insufficient to support a guilty verdict. Specifically, he argues that the government failed to show that he had knowledge of the objectives of the drug and kidnapping conspiracies or that he willingly entered into such conspiracies.

In determining whether to sustain a conviction, we view the evidence in the light most favorable to the government

and determine whether a trier of fact could have found each element of the charged offense beyond a reasonable doubt. United States v. Schramm, 75 F.3d 156, 159 (3d Cir. 1996). In short, we "will reverse for insufficient evidence only where the failure of the prosecution is clear." Government of the Virgin Islands v. Isaac, 50 F.3d 1175, 1179 (3d Cir. 1995).

On a conspiracy charge, the government need not prove conspiratorial intent through direct evidence. Rather, the government can rely "entirely on circumstantial evidence to prove that an alleged conspirator had the knowledge and intent necessary to commit the crime." United States v. Carr, 25 F.3d 1194, 1201 (3d Cir. 1994). Here, the government presented testimony that Quinones was present at the initial meeting in November of 1994 between Avendano and Montalvo, in which they discussed negotiating a possible deal with Ochoa. The government also showed that Quinones travelled with all of the kidnappers and Avendano from Quinones's house in New York to Maryland. Moreover, it was established that Quinones was present when Moreno threatened Avendano with the .357 magnum and that Quinones made an attempt to escape when the police entered the Maryland house.

From all of these circumstantial facts, a reasonable juror could infer that Quinones knowingly and intentionally participated in the drug and kidnapping conspiracies. Accordingly, we conclude that the evidence was sufficient to support Quinones's conviction on all counts.

## F. Speedy Trial Act

Moreno filed a supplemental pro se brief alleging that the government violated his right under the Speedy Trial Act to be charged by indictment within thirty days after being arrested or served with a complaint.

The Speedy Trial Act, 18 U.S.C. § 3161(b), requires that:

Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.

Moreno contends that his conviction on the § 924 count should be reversed because the government did not indict him on this count within thirty days of his initial arrest. As the government properly points out, however, Moreno was not charged upon arrest with violating § 924. Rather, he was initially charged on that count through a formal, superseding indictment. Section 3161(b) plainly states that it only applies if the arrest was made "in connection with such charges." Because Moreno had already been arrested on charges stemming from the first indictment, there was no arrest in connection with the § 924(c)(1) charge. Accordingly, the thirty-day time limit does not apply. See United States v. Beal, 940 F.2d 1159, 1162 (8th Cir. 1991).

Moreover, Moreno failed to move for dismissal of the indictment prior to trial. Section 3162(a)(2) of the Speedy Trial Act clearly states: "Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section." 18 U.S.C. § 3162(a)(2). See also United States v. Patten, 826 F.2d 198, 199 (2d Cir. 1987) (per curiam) (rights under Act waived when defendant did not request dismissal until after jury selection began); United States v. Jernigan, 20 F.3d 621, 622 n.2 (5th Cir. 1994) (rights under Act waived when defendant did not move for dismissal prior to trial). Accordingly, we reject Moreno's Speedy Trial Act claim.

## G. Suppression

Montalvo, Pacheco, Quinones, Moreno, and Palma-Ruedas claim that the district court erred by failing to suppress the evidence seized at the Maryland residence. Specifically, the defendants contend that there was insufficient probable cause to support a search warrant.

Defendants' claim is without merit. When the police came to the house in Maryland, they were able to corroborate Mr. Avendano's story through the police in New Jersey. Thus, the magistrate clearly "had a `substantial basis for . . . concluding' that a search would uncover evidence of wrongdoing." Illinois v. Gates, 462 U.S. 213, 236 (1983) (quoting Jones v. United States, 362 U.S. 257 (1960)). Accordingly, there was sufficient probable cause to support a search warrant.

Moreover, even if the warrant was not supported by sufficient probable cause, suppression would be inappropriate because the police reasonably relied on the warrant. See United States v. Leon, 468 U.S. 897, 920–22 (1984); United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993). Accordingly, the district court properly admitted the evidence seized from the Maryland house.

## H. **Admission of Hearsay Testimony**

When the defendants were at the house of Quinones in New York, a police detective came to the door to check on a suspicious car in the driveway. Rosemary Alvarez, Quinones's wife, answered the door with Montalvo. At trial, the police detective testified that Alvarez told him that Montalvo was "Carlos Torres."

Montalvo objects to the admission of the detective's testimony, claiming that it was inadmissible hearsay. Whether evidence is hearsay is a question of law subject to plenary review. United States v. Sallins, 993 F.2d 344, 346 (3d Cir. 1993).

We agree with the district court that the detective's testimony was not hearsay. The testimony was not introduced to prove that Montalvo really was "Carlos Torres" -- i.e., it was not admitted to prove the truth of the matter asserted. See Fed. R. Evid. 801(c). Rather, the testimony was offered to show consciousness of guilt and to show that the statement was, in fact, false. See United States v. Levy, 865 F.2d 551, 558 (3d Cir. 1989) (in banc) (noting that "defendants' attempt to conceal their true identities by providing aliases to the police upon arrest is relevant as consciousness of guilt"); Anderson v. United States, 417 U.S. 211, 219–20 (1974) (holding that statements were not hearsay when admitted "to establish a foundation for later showing, through other admissible evidence, that they were false") (citations omitted).

Even though Montalvo did not offer the information himself, he allowed Alvarez to offer the false statement without correcting her. The statement was thus probative regarding consciousness of guilt because the jury could have reasonably inferred that Montalvo welcomed Alvarez's misidentification of him. J.App. at 313. Further, we agree

26

with the district court that the admission of the statement was not prejudicial. Thus, we conclude that the district court properly admitted the testimony of the detective.

## I. <u>Evidence of Montalvo's Past Name</u>

Montalvo argues that the district court abused its discretion when it allowed the government to ask Montalvo's former mother-in-law on cross-examination whether she had ever known Montalvo by any other name. On direct examination, Montalvo's mother-in-law repeatedly referred to Montalvo as "Omar." On cross, the prosecutor asked whether she had ever known Montalvo by any other name. She replied that she had known him as "Rubin Tascon" and that, in fact, "Rubin Tascon" was the name that appeared on her daughter's marriage certificate.

The trial court enjoys "sound discretion" in determining the scope of cross-examination. <u>United States v. Werme</u>, 939 F.2d 108, 117 (3d Cir. 1991). Here, the district court, after considering Montalvo's objection, determined that the prosecutor could elicit testimony tending to prove that Montalvo's mother-in-law did not normally refer to him as Omar. The testimony was probative because it tended to support the inference that Montalvo knew he was breaking the law and was trying to hide behind an alias. <u>See Levy</u>, 865 F.2d at 558. In addition, we agree with the district court's determination that the witness's reference to Montalvo's "real name" -- Rubin Tascon -- was not unduly prejudicial. Accordingly, the district court did not abuse its discretion in allowing the government to make this point on cross-examination.

## J. <u>Government's Reference in Closing to Montalvo's Past Names</u>

Montalvo claims that he was denied a fair trial because the government referred, in closing, to Montalvo's past names. Because Montalvo made no objection to the prosecutor's closing at trial, he is required to show plain error. <u>United States v. Anderskow</u>, 88 F.3d 245, 249 (3d Cir. 1996); <u>see also United States v. Price</u>, 76 F.3d 526, 530 (3d Cir. 1996) (defining plain error as " `egregious error or a manifest miscarriage of justice' "). We conclude that Montalvo cannot show plain error as required.

27

In closing, the government referred to "Carlos Torres" and "Rubin Tascon" as names previously used by Montalvo. Yet, as discussed in the previous section, both of these past names had already been submitted to the jury through the testimony of witnesses. Because we have concluded that the district court did not abuse its discretion in admitting evidence of Montalvo's aliases through the testimony of witnesses, we can hardly conclude that the government's reference to these names in closing rose to the level of plain error.

## K. <u>Exclusion of Hearsay Testimony of Marilyn Hernandez</u>

Quinones argues that the district court committed reversible error when it refused to admit the testimony of Marilyn Hernandez regarding the meeting between Avendano, Montalvo, and Quinones. The defense attempted to admit Hernandez's statement that when Montalvo introduced Avendano to Quinones at Quinones's house on January 1, 1995, Quinones said, "Nice to meet you." Quinones's theory was that this statement tended to rebut Avendano's contention that Quinones was at the initial meeting with Montalvo and Avendano in November 1994, and that the statement showed that Quinones did not know that Avendano was being held against his will.

The district court excluded the testimony as hearsay. Quinones argues that the statement was not hearsay because it was not being offered to prove the truth of the statement. See Fed. R. Evid. 801(c). In the alternative, he argues that even if the statement was hearsay, it was admissible under Rule 803(3), which allows the admission of statements of the declarant's then existing state of mind. See Fed. R. Evid. 803(3). Thus, the first question is whether or not the statements regarding the meeting between Quinones and Avendano were offered to prove the matter asserted -- i.e., that Quinones and Avendano had never met before January 1, 1995.

The district court found that the statements were offered precisely to prove the truth of the matter asserted-- that is, that Quinones and Avendano did not know each other. Quinones makes a hypertechnical, syntactic argument by

asserting that the relevance of the statement was not that Quinones really thought that "it was nice" to meet Avendano but, rather, merely that the statements were said. Quinones's counsel, however, undermined this argument in closing when he asserted that Quinones could not have been at the November 1994 meeting "because they never met before January 1, 1995." J.App. at 559; see United States v. Sallins, 993 F.2d 344, 347 (3d Cir. 1993) (noting that defense counsel's use of the statement for its truth in closing argument confirms that the statement was inadmissible hearsay). While Quinones may not have offered the statement for its express meaning, he did offer it for the implied assertion that he had never met Avendano. Statements offered to support an implied assertion are inadmissible hearsay. See United States v. Reynolds, 715 F.2d 99, 104 (3d Cir. 1983).

Nor are we convinced by Quinones's argument that the statement fell within Rule 803(3)'s exception to the hearsay rule. Statements admitted to show state of mind under Rule 803(3) "cannot be offered to prove the truth of the underlying facts asserted." Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1274 (3d Cir. 1995).

Moreover, even if the statement was admissible, its omission did not constitute prejudicial error. The district court allowed the inference that the defense hoped to get across by allowing Hernandez to testify that in her opinion Quinones and Avendano were meeting for the first time. J.App. at 396. Further, as noted earlier, defense counsel was able to refer to the excluded statement in closing. J.App. at 542, 551, 558-59. Thus, because defense counsel was able to get the point across to the jury anyway, the district court's ruling, if error, was harmless.

## L. District Court's Comments on Defense Witness Testimony

Quinones further argues that the district court's response to the testimony of Marilyn Hernandez served to undermine her credibility and unfairly prejudice Quinones. As such, Quinones claims that the district court's failure to remain neutral and detached constitutes plain error. We are unpersuaded.

When reviewing for plain error, we look for errors that "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." United States v. Price, 13 F.3d 711, 724 (3d Cir. 1994) (quoting United States v. Young, 470 U.S. 1, 16 (1985)). In response to defense counsel's repeated attempts to elicit hearsay testimony from Hernandez, the judge commented out of frustration: "This is so bizarre." In our view, this statement is nothing more than a benign reflection of the judge's reaction to defense counsel's persistence. See United States v. Beaty, 722 F.2d 1090 (3d Cir. 1983) (upholding defendant's conviction when judge's actions reflected "frustrat[ion] by counsel's repeated attempts to do that which he had properly been forbidden to do"). In any event, the judge immediately apologized to the jury, see J.App. at 397, and later instructed the jury to disregard any comments that she may have made with regard to witness testimony, reminding them that they were "the sole judges of the credibility of the witnesses." Supp. App. at 192, 196–97. Thus, we conclude that the judge's actions did not "reach the point where it appear[ed] to the jury that the court believe[d] the accused [was] guilty." Price, 13 F.3d at 723. Accordingly, we find no plain error.

## M. Guard's Remark Regarding Defendant's Incarceration

Finally, Palma-Ruedas argues that a court guard impermissibly conveyed to the jury that he was incarcerated, in violation of his due process right to a fair trial. See Estelle v. Williams, 425 U.S. 501, 503–05 (1976) (Fourteenth Amendment rights of defendant violated when compelled to stand trial before jury while dressed in identifiable prison clothes). We find that the guard's remark here falls far short of the due process violation discussed in Estelle.

On the seventh day of the trial, Palma-Ruedas's lawyer told the district court that in the morning, as she was coming into the courthouse with two jurors, a court security officer told them: "You can't go down yet, your packages are not here." One juror responded, "What packages?" The officer responded, "The packages, if you catch my meaning."

Palma-Ruedas claims that the guard's random remark tainted the jurors and, accordingly, that his convictions should be reversed. At trial, Palma-Ruedas noted to the district court only that he "wanted to put it on the record" and asked for no specific relief. In other words, Palma-Ruedas did not ask for a mistrial, nor did he ask the court to look into the matter further. Palma-Ruedas's failure to seek relief is telling because it tends to show that, at the time, Palma-Ruedas did not think the guard's remarks were particularly damaging to his fair trial rights. See United States v. Colletti, 984 F.2d 1339 (3d Cir. 1992) (noting that defendant's failure to ask for correction at trial supports the "inference that . . . the incident was not nearly as significant as the present argument would suggest").

In any event, we are not convinced that the guard's remark was unduly prejudicial. Indeed, we find it unlikely that the jurors even had any idea what the guard was talking about; jurors are not usually well-versed in the jargon of courthouse guards. Moreover, even assuming the jurors understood the guard's oblique reference, in our view, this random remark to two jurors is insufficient to constitute a violation of Palma-Ruedas's due process rights to a fair trial. See United States v. Villabona-Garnica, 63 F.3d 1051, 1058 (11th Cir. 1995) (distinguishing Estelle where the prison clothing was a "constant reminder" to the jury that the defendant was incarcerated, from defendant's remark on cross-examination that he was incarcerated).

For the foregoing reasons, we reverse Defendant Moreno's § 924(c)(1) conviction for improper venue. We affirm the defendants' convictions in all other respects.

31

ALITO, Circuit Judge, concurring in part and dissenting in part:

I join the opinion of the court except insofar as it reverses Moreno's conviction under 18 U.S.C. § 924(c)(1) on the ground that venue in the District of New Jersey was constitutionally impermissible. The majority reaches this result based on the so-called "verb test." Applying this test, the majority holds that a violation of 18 U.S.C. § 924(c)(1) may be prosecuted only where the defendant used or carried the firearm and not where the defendant committed the underlying crime of violence or drug trafficking crime. Accord United States v. Corona, 34 F.3d 876, 879 (9th Cir. 1994).[1]

I disagree with this analysis and conclusion. Instead of relying solely on the "verb test," I think that we should inquire where, in substance, the offense was "committed." United States Constitution, Art. III, sec. 2, cl. 3 & Amend. VI. In other words, we should make a realistic appraisal of the "nature of the crime" defined by the statute. Cf. United States v. Anderson, 328 U.S. 699, 703 (1946). When the offense created by 18 U.S.C. § 924(c)(1) is examined in this way, it is apparent that the commission of the crime of violence or drug-trafficking crime is a critical element of the offense and that permitting venue in a district in which the commission of this underlying crime occurred is consistent with the Constitution's venue provisions.[2]  Accord United States v. Pomranz, 43 F.3d 156, 161-62 (5th Cir. 1995);[3] United States v. Friedman, 1996 WL 612456, *6 (E.D.N.Y.).

_____

1. Although the majority interprets the Constitution's venue provisions as embodying the "verb test," the majority seems to suggest (a) that Congress can bypass the verb test by specifying venue itself and (b) that this congressionally specified venue will pass constitutional muster "as long as the venue bears some relation to the offense." (Maj. Op. at 14-15)(footnote omitted). But if the majority is correct that the verb test is constitutionally mandated, how can Congress bypass it and specify venue in any place that merely "bears some relation to the offense"?

2. For convenience, I refer to Article III, section 2, clause 3 of the Constitution and the relevant provision of the Sixth Amendment as the Constitution's venue provisions. See footnote 6, infra.

3. Although I agree with the holding in Pomranz, I do not endorse all of the reasoning in that opinion. Specifically, I do not think that the prosecution's convenience or inconvenience per se (see 43 F.3d at 161 n.8) is a relevant factor in ascertaining the scope of the Constitution's venue provisions.

32

I.

The criminal statute at issue here provides, in pertinent part, as follows:

Whoever, during and in relation to any crime of violence or drug trafficking crime . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years. . . .[4]

18 U.S.C. § 924(c)(1) (emphasis added). "[U]ses" and "carries" are verbs. "[D]uring and in relation to any crime of violence or drug trafficking crime" is a prepositional phrase. Under the majority's "verb test," venue is proper in only those districts in which occurred actions denoted in the relevant criminal statute by verbs. Accordingly, in this case, the majority concludes, the "verb test" restricts venue to the District of Maryland, where Moreno carried a firearm, and precludes venue in those other districts, including the District of New Jersey, through which the crime of violence, kidnapping, moved.

The verb test thus makes syntax constitutionally determinative. Consider the result that would follow if 18 U.S.C. § 924(c) were rephrased slightly as follows:

Whoever during and in relation to **commits** any crime of violence or drug trafficking crime . . . for which he may be prosecuted in a court of the United States **and during and in relation to that crime** uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.

This version is wordier than the original, but its meaning is the same. However, because of the addition of the verb "commits," the "verb test" would presumably permit venue in any district in which the crime of violence or drug trafficking crime was committed. I cannot believe that the

_____

4. The statute goes on to prescribe sentences of 10 or 30 years for cases involving certain types of firearms. Id.

meaning of the constitutional restrictions on venue turns on such syntactical trifles.

The apparent author of the "verb test," Judge Armistead M. Dobie of the Fourth Circuit, does not seem to have claimed any such office for his creation. In the article usually cited as the source of the test, Judge Dobie wrote:

All federal crimes are statutory, and these crimes are _often_ defined, hidden away amid pompous verbosity, in terms of a single verb. That essential verb _usually_ contains the key to the solution of the question: in what district was the crime committed. Without the exact language of the statute, particularly this verb, paraphrases and loose citations in this field, are more than inaccurate, they are positively misleading. When, as is so often the case, the statute enumerates several such verbs, only scrupulous, even meticulous, nicety in exact quotation can prevent these statutes, as well as the decisions under them, from proving a snare and delusion to the unwary.

Armistead M. Dobie, Venue in Criminal Cases in the United States District Court, 12 Va. L. Rev. 287, 289 (1926) (emphasis added); see also United States v. Walden, 464 F.2d 1015, 1018 (4th Cir. 1972). As the quoted language demonstrates, Judge Dobie did not suggest that the verb test was "the proper" or "only" method to determine venue. He merely suggested that the verb test was "usually" the best method to determine venue. Cf. Norman Abrams, Conspiracy and Multi-Venue in Federal Criminal Prosecutions: The Crime Committed Formula, 9 UCLA L. Rev. 751, 777 (1962) (verb test, although important,"constitutes only the first step" in determining venue).

II.

Article III, section 2, clause 3 of the Constitution provides that "[t]he trial of all Crimes, except in Cases of Impeachment . . . shall be held in the State where the said crimes shall have been committed" (emphasis added).5

_____

5. Federal Rule of Criminal Procedure 18 echoes this command, providing that the "prosecution shall be had in a district in which the offense was committed."

34

Similarly, the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed" (emphasis added).6 Is an offense "committed," for constitutional purposes, in only those places in which actions denoted by verbs occurred? Perhaps this is obvious to the majority, but it is not apparent to me. Thus, the constitutional text, by itself, does not seem to me to provide a sufficient basis for adopting the verb test.

Nor am I aware of other evidence that these constitutional provisions were meant to embody the verb test, i.e., to force Congress to think about its use of grammar in formulating criminal statutes. On the contrary, the origin of these constitutional provisions shows that they were adopted to achieve important substantive ends-- primarily, to deter governmental abuses of power. Cf. United States v. Johnston, 323 U.S. 273, 276 (1944) ("Questions of venue in criminal cases . . . are not merely matters of formal legal procedure. They raise deep issues of public policy . . . .").

"As the difficulties between the American colonies and Great Britain increased during the period immediately prior to the American Revolution, those in authority who represented the royal interests became concerned that royal interests could not be adequately protected in American courts, particularly when American colonists were charged with crimes." Drew L. Kershen, Vicinage 29 Okla. L. Rev. 803, 805 (1976). In 1769, despite warnings that such a measure might lead to war, Parliament revived an ancient statute under which American colonists accused of treason could be taken to England or another colony for trial. See William Wirt Blume, The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue, 43 Mich. L. Rev. 59, 63– 64 (1944); Kershen, supra, 29 Okla. L. Rev. at 805–06.

---

6. Strictly speaking, Article III, section 2, clause 3 concerns venue (where the trial occurs), whereas the Sixth Amendment concerns vicinage (where the jury is drawn). It has been said, however, that"[t]his technical distinction is of no importance." Charles A. Wright, 2 Federal Practice & Procedure (Criminal), § 301 at 190 (1982 & 1996 Supp.).

35

During the next few years, Parliament enacted similar laws applicable to persons charged with offenses such as destroying dock yards, magazines, ships, ammunition, or supplies. Blume, supra, 43 Mich. L. Rev. at 63; Kershen, supra, 29 Okla. L. Rev. at 806-07. Resentment against these measures was so deep that the Declaration of Independence denounced King George III "[f]or transporting us beyond Seas to be tried for pretended offenses." This practice has been described as one of the precipitating factors of the American Revolution. See, e.g., Blume, supra, 43 Mich. L. Rev. at 63-67.

After the Boston Massacre, Parliament also passed a law, 14 Geo. III, c.39 (1774), designed to protect British soldiers who were charged in Massachusetts with capital offenses based on actions taken in suppressing riots or enforcing the revenue laws. Kershen, supra, 29 Okla. L. Rev. at 807. If it appeared to the governor that "an indifferent trial" could not be held in Massachusetts, the accused could be tried in England or another colony. Id. "This circumvention of the judgment of the victimized community was attacked as a `Mock Trial' system in the Declaration of Independence." Akhil Reed Amar, The Constitution and Criminal Procedure -- First Principles 243 n.163 (1997).7

Following independence, several states adopted constitutional provisions limiting a criminal prosecution to the place where the crime was "committed"8 or where the "facts" "ar[o]se"9 or "happen[ed].10 And a few years later, similar safeguards were placed in Article III, section 2, and the Sixth Amendment.11

_____

7. The Declaration of Independence charged the king with "protecting [troops], by a mock trial, from Punishment for any Murders which they should commit on the Inhabitants of these States."

8. N.H. Const. of 1784, art. I, § 17.

9. Md. Const. of 1776, Declaration of Rights, art. 18.

10. Mass. Const. of 1780, Part first, art. 13.

11. At the Federal Constitutional Convention, several proposals were introduced to restrict venue to the state where the offense was "committed." See Francis Heller, The Sixth Amendment 22-24 (1951). These proposals engendered little debate, none of which seems to have focused on precisely what was meant by the place where an offense was "committed." Id. Likewise, debate on the Sixth Amendment did not elucidate this question. For a summary of this debate, see Kershen, supra, 29 Okla. L. Rev. at 817-28.

Justice Story explained the purpose of these provisions as follows:

> The object . . . is to secure the party accused from being dragged to a trial in some distant state, away from his friends, and witnesses, and neighbourhood; and thus subjected to the verdict of mere strangers, who may feel no common sympathy, or who may even cherish animosities, or prejudices against him. Besides this; a trial in a distant state or territory might subject the party to the most oppressive expenses, or perhaps even to the inability of procuring the proper witnesses to establish his innocence.

Joseph Story, Commentaries on the Constitution § 925 (Carolina Academic Press reprint 1987). Recent scholarship has suggested another possible purpose: to protect a community's right to have trials of local offenses occur in the community. See Amar, supra, 124 & n.163.

Against this background, I reject the suggestion that the meaning of the constitutional venue provisions is to be determined by diagramming the language of the relevant criminal statute. Would the framers have thought that prosecuting an American colonist in England on a charge of treason was permissible if Parliament had been able to craft a treason statute in which a verb denoted an action occurring in England? The answer is no. The constitutional venue provisions were meant to put in place important substantive protections against government abuse.[12]

_____

12. It is crucial to understand that the venue protection is, at its heart, a protection or check against a government seeking to overreach the power granted to it by the people. A government (whether the English Parliament or some modern-day Congress) consciously seeking to overreach its powers and checked only by the verb test could bypass the venue protections of Article III and the Sixth Amendment by carefully placing verbs in its criminal statutes that would define the criminal acts of a defendant in terms of their effect on entities or persons in regions where prosecution would be easy for the government.

My point is simple. The verb test may be a usefulfirst cut at determining venue. But as recent cases have demonstrated, verbs (and hence the verb test) can be stretched broadly. Cf. United States v. Angotti, 105 F.3d 539, 542-55 (majority) & 547 (Norris, J., dissenting)

III.

The Supreme Court has never embraced the "verb test." Rather, the Court has instructed that venue must be determined by looking to "the nature of the crime" and the "location of the act or acts constituting it." United States v. Anderson, 328 U.S. 699, 703 (1946). See also Travis v. United States, 364 U.S. 631, 635 (1961); United States v. Cores, 356 U.S. 405, 408 (1958). Nor, as far as I can tell, has any court of appeals held that the "verb test" is the only proper test for determining where venue is constitutionally permitted. Most of the cases suggest that, while the "verb test" may provide a usefulfirst cut at determining venue, there are complicated crimes for which a rigid grammar-based test may not be appropriate. See, e.g., United States v. Cofield, 11 F.3d 413, 417 (4th Cir. 1994) (examination of the verbs in a statute is not the exclusive method of determining venue; "there are crimes where the situs is not so simple of definition") (quoting

_____

(9th Cir. 1997) (in evaluating venue under a statute that made it criminal to "knowingly make" certain false statements for the "purpose of influencing" the actions of a federally insured institution, the court held that a statement was "made" not only where it was physically submitted to the local financial institution (an intermediary), but also at the point where it was received by the institution or persons whom it ultimately influenced); cf. also United States v. Crawford, 1997 WL 339295, *7-8, 115 F.3d 1397, __ (8th Cir. 1997) (in determining venue under a statute criminalizing the "failure to make" child support payments to a child who "resides" in another state, court held that the "failure to make" the payments occurred not only in the states where the defendant was and where the court order was imposed, but also where the child resided); United States v. Murphy, 1997 WL 349887, *3, __ F.3d __, __ (4th Cir. 1997) (same conclusion as Crawford, but in reaching its outcome court focussed on the verb "resides," even though"resides" refers to the child and not the defendant). (I cite these cases, not to express agreement or disagreement with their holdings, but as illustrations of the malleability of the "verb test.") If we limit ourselves to the protection of the verb test, we, in effect, eliminate our protection against a government that wants to overreach its power and is willing to carefully structure its use of grammar in criminal statutes to achieve that goal. It was an overreaching government that the venue protection was geared towards, not a government that was not careful enough with its use of grammar.

United States v. Billups, 692 F.2d 320, 332 (4th Cir. 1982));
United States v. Newsom, 9 F.3d 337, 339 (4th Cir. 1993)
("the verbs examination method is not exclusive") (quotation
omitted); United States v. Beddow, 957 F.2d 1330, 1335
(6th Cir. 1992) (employing a "substantial contacts" test for
determining venue); United States v. Beech-Nut Nutrition
Corp., 871 F.2d 1181, 1188-89 (2d Cir. 1989) (same);
United States v. Tedesco, 635 F.2d 902, 905 (1st Cir. 1980)
(verb test is "[o]ne" method of determining venue). Indeed,
even the Ninth Circuit, whose analysis and conclusion in
Corona the majority follows, has explicitly disavowed a
reading of Corona that would suggest that the verb test was
"the" interpretive tool to be used in determining venue. See
Angotti, 105 F.3d at 544 (leaving open the question whether
"focus on key verbs should be the exclusive measure of
venue").

IV.

Showing that rigid application of the "verb test" is wrong
is simpler than setting out an alternative "test" that works
in all cases, and I will not attempt to do the latter here. For
present purposes, it is enough to show that in a
prosecution under 18 U.S.C. § 924(c)(1) the commission of
the crime of violence or drug trafficking crime is a
sufficiently important element to permit venue in any
district in which the defendant engages in that conduct.

It is apparent from the text of 18 U.S.C. § 924(c)(1) that
the defendant's commission of the underlying crime of
violence or drug trafficking offense forms a vital part of the
evil that Congress sought to punish and prevent.13

_____

13. This element involves conduct that is in itself wrongful; as the
District of Columbia Circuit has observed, this element is not simply a
jurisdictional " `hook' on which to hang a federalized prohibition against
the use and carrying of firearms." United States v. Anderson, 59 F.3d
1323, 1327 (D.C. Cir. 1995) (in banc); cf. Peter W. Low and Joseph L.
Hoffman, Federal Criminal Law 6 (1997) ("Nothing has so distorted
federal criminal law as the habit of defining federal crimes in such a way
as to make jurisdictional requirements appear to be penologically
significant elements of the offense. This confuses federal power to
prohibit certain conduct with the nature of the crime itself.") (citation
omitted); but cf. Abrams, supra, 9 UCLA L. Rev. at 779 (noting how
courts do on occasion interpret jurisdictional elements in a statute as
essential act elements for purposes of determining where the crime was
committed).

Although 18 U.S.C. §924(c)(1) has been held to create an offense distinct from the underlying crime, see Anderson, 59 F.3d at 1326, it is noteworthy that this provision prescribes the imposition of a penalty "in addition to the punishment provided for [the] crime of violence or drug trafficking crime." For this reason, 18 U.S.C. § 924(c)(1) has been described as constituting, at least in part, a "penalty enhancement statute." Anderson, 59 F.3d at 1326. This surely demonstrates that a central focus, if not the central focus, of the statute is the commission of the underlying crime of violence or drug trafficking crime.

It is also telling that eight courts of appeals have held that "only one § 924(c)(1) violation can be appended to any single predicate crime." Anderson, 59 F.3d at 1328 (emphasis added); see also United States v. Cappas, 29 F.3d 1187, 1189 (7th Cir. 1994) (citing cases); United States v. Lindsay, 985 F.2d 666, 674 (2d Cir. 1993); United States v. Sims, 975 F.2d 1225, 1233 (6th Cir. 1992); United States v. Moore, 958 F.2d 310, 312 (10th Cir. 1992); United States v. Hamilton, 953 F.2d 1344, 1346 (11th Cir. 1992); United States v. Privette, 947 F.2d 1259, 1262–63 (5th Cir. 1991); United States v. Fontanilla, 849 F.2d 1257, 1258–59 (9th Cir. 1988); but see United States v. Lucas, 932 F.2d 1210, 1222–23 (8th Cir. 1991). If the use or carrying of the firearm were the heart of the offense and the commission of the underlying crime of violence or drug trafficking crime were a mere appendage that is insufficiently important to confer venue, these holdings would be hard to understand. Instead, one would expect these courts to have held that every single use or carrying of a gun in the context of a single drug crime or crime of violence would be a separate offense. The contrary holding by eight of the nine circuits to have addressed the issue reveals their understanding that the underlying predicate offense in Section 924(c)(1) is at the center of Congress's aim. See Pomranz, 43 F.3d at 160; United States v. Taylor, 13 F.3d 986, 993–94 (6th Cir. 1994) ("the predicate offense, not the firearm, is the object of § 924(c)(1)"); United States v. Correa Ventura, 6 F.3d 1070, 1083 (5th Cir. 1993) (the "essence" of the offense was that the defendant used a firearm while committing another federal crime); but see Corona, 34 F.3d at 880 (predicate

40

drug crime during which the firearm was used was no more than a preparatory act and hence could not confer venue).

Moreover, a defendant is at least as likely to have significant ties to a place where he is alleged to have committed the crime of violence or drug trafficking crime as he is to have significant ties to the place where he is alleged to have carried or used the firearm. And a defendant's alleged commission of a crime of violence or drug trafficking crime is at least as likely to present a central issue at trial (thus making access to witnesses and proof important) as is the element of carrying or using a firearm. For these reasons, prosecuting a defendant under 18 U.S.C. § 924(c)(1) in a district in which the crime of violence or drug trafficking crime took place does not involve the type of government abuse that the constitutional venue provisions were meant to prevent.

Section 924(c)(1)'s legislative history confirms the critical importance of the element requiring proof that the defendant committed a crime of violence or drug trafficking offense. Representative Poff, Section 924(c)(1)'s sponsor, stated that this provision targeted "the criminal rather than the gun." Anderson, 59 F.3d at 1327 (citing 114 Cong. Rec. at 22,231 (1968)). He explained that the provision sought to persuade those individuals seeking to commit certain felonies "to leave [their] gun[s] at home." Id. at 1328 (citing 114 Cong. Rec. at 22,231). Indeed, he said that "the prosecution for the basic felony and the prosecution under my substitute would constitute one proceeding out of which two separate penalties may grow." Id. at 1327 (citing 114 Cong. Rec. at 22, 232) (emphasis added).

In sum, the predicate crimes defined in 18 U.S.C. § 924(c)(1), crimes of violence and drug trafficking crimes, are essential elements of the course of conduct that Congress sought to criminalize. I would hold, therefore, that venue for a prosecution under this statute lies in any district in which the defendant committed the underlying crime of violence or drug trafficking offense.

V.

If the majority's adoption of the "verb test" is taken seriously and applied in all future venue cases, it will lead to difficulties.

41

For one thing, we will have to delve into questions of grammar that most of us probably left behind in secondary school. The majority suggests that venue questions require us to identify the "key verbs" in the statute, but it is not clear precisely what it means by a "key verb," a term that I do not believe has grammatical significance. Does the term "key verb" mean a verb in the main clause? Or does it include any verb in a subordinate clause as well? This point recently divided the district court and the Fourth Circuit in applying the "verb test" to 18 U.S.C. § 228(a), which provides in pertinent part as follows (emphasis added):

Whoever willfully <u>fails</u> to pay a past due support obligation with respect to a child who resides in another State shall be punished as provided in subsection (b).

The district court focused on the verb in the main clause ("fails") and held that venue was proper where the payment was ordered to be paid, as opposed to where the child resided. <u>Murphy v. United States</u>, 934 F. Supp. 736, 739–40 (W.D. Va. 1996). Reversing, the Fourth Circuit pointed to the verb "resides" in the subordinate clause and concluded that venue was also proper in the district of the child's residence. <u>Murphy</u>, __ F.3d at __, 1997 WL 349887, *3.

Whether or not a verb in a subordinate clause may qualify as a "key verb," I assume that a "verbal phrase," <u>i.e.,</u> a participial, gerund, or infinitive phrase, cannot qualify. As a grammar book explains:

Verbals are so called because they are formed from verbs. In some respects they act like verbs. They may express action; they may have modifiers; and they may be followed by complements. In one important respect, however, they are not like verbs: verbals are not used as verbs in a sentence. They are used as other parts of speech -- as nouns, as adjectives, or as adverbs.

John E. Warriner and Francis Griffith, <u>English Grammar and Composition</u> 40–41 (1973).

If my assumption is wrong -- if verbal phrases can qualify as "key verbs" -- then I challenge the majority to

42

explain why it is proper to look to this type of noun, adjective, or adverb (i.e., a verbal serving as a noun, adjective, or adverb) and not others. On the other hand, if this assumption is right, then the verb test will lead to some surprising results.

There are a great many federal criminal statutes that are phrased along the following lines: It shall be unlawful to do x. See, e.g., 18 U.S.C. §§ 602, 603, 607(a), 795(a), 842, 922, 964(a), 1082(a), 1731, 1752(a), 1962, 2342. In all of these statutes, the "key verb," I take it, is "shall be" -- which cannot possibly show where the offense was committed or where it should be prosecuted. The crux of the offense is expressed with an infinitive ("to do x") that functions as an adverb that modifies the adjective "unlawful." Is it proper under the "verb test" to rely on this adverbial phrase? If so, why is it not proper in the case before us to rely on the adverbial phrase "during and in relation to"?

Consider 18 U.S.C. § 922(g), a statute that, like 18 U.S.C. § 924(c)(1), deals with the subject of firearms possession. Section 922(g) provides:

It shall be unlawful for any person --

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

(2) who is a fugitive from justice;

(3) who is an unlawful user of or addicted to any controlled substance . . . ;

(4) who has been adjudicated as a mental defective or who has been committed to a mental institution;

(5) who, being an alien, illegally or unlawfully in the United States;

(6) who has been discharged from the Armed Forces under dishonorable conditions;

(7) who, having been a citizen of the United States, has renounced his citizenship; or

(8) who is subject to [a certain type of court order restraining such person from, among other things,

43

harassing, stalking, or threatening an intimate partner or his or her child]; or

. . .

(9) who has been convicted in any court of a misdemeanor crime of domestice violence,

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

What are the "key verbs" in this statute? Is the only key verb the verb "shall be" in the main clause? Or do the verbs in the subordinate clauses qualify as well? If so, is venue proper where an accused "has been convicted" (§ 922(g)(1)), "is a fugitive" (§ 922(g)(2)),"is an unlawful" drug user or addict (§ 922(g)(3)), "has been adjudicated as a mental defective" or "has been committed to a mental institution" (§ 922(g)(4)), etc? Or is it permissible to look to the verbal phrases ("to ship or transport," etc.) as well?

Rather than relying on grammatical arcana, we should, as I have argued above, look at the substance of the statutes in question. Here are two examples of sets of cases that exemplify this approach.

The Taft-Hartley Act, 29 U.S.C. Section 186(a), states in relevant part:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value --

(1) to any representative of any of his employees who are employed in an industry affecting commerce ; or . . .

(emphasis added). The verb in the main clause is "shall be." "[A]cts" is the verb in the subordinate clause "who acts. . . ." "[T]o pay, lend, . . ." is a verbal phrase that functions as an adverb modifying "acts." "[A]ffecting commerce" is another verbal phrase, specifically a participial phrase that

44

serves as an adjective modifying "industry." What are the "key verbs" in this statute?

In United States v. Billups, supra, the Fourth Circuit said, in effect, "We don't care." The court specifically refused to apply the "verb test," observing that "this method is not exclusive." 692 F.2d at 332. Instead, the court drew an analogy to the Hobbs Act, 18 U.S.C. § 1951, which provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined . . . or imprisoned . . ., or both.

Billups, 692 F.2d at 332 n.10 (emphasis added).

Noting that courts had held that venue in Hobbs Act cases was proper wherever commerce was affected, the Billups court concluded that the same rule should be applied under the Taft Hartley Act. 692 F.2d at 332–33. The fact that the Hobbs Act sets out the commerce element by means of verbs ("obstructs, delays, or affects"), whereas the Taft Hartley Act does not, was of no moment to either the Billups court or the other courts that have analogized the venue questions under the two acts. See id.; United States v. Lewis, 797 F.2d 358, 367 (7th Cir. 1986); United States v. Reed, 773 F.2d 477, 482 (2d Cir. 1985).

Two different obstruction of justice statutes, 18 U.S.C. §§ U.S.C. 1513 and 1503, present a similar issue. Section 1513(b) provides:

Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for ––

(1) the attendance of a witness or party at an official proceeding, or any testimony given or any record,

45

document, or other object produced by a witness in an official proceeding;

shall be fined . . . or imprisoned . . . or both.

(emphasis added).

In United States v. Cofield, 11 F.3d 413 (4th Cir. 1994), the court held that even though the defendant's acts of retaliation against a witness took place in the District of Columbia, venue was proper in the Eastern District of Virginia, because that was the location of the underlying judicial proceeding in which the witness testified. The court reached this conclusion even though there are no verbs in Section 1513(b)(1)14 that would place venue in any location other than that in which the acts of retaliation or threats took place. Id. at 417 (rejecting the use of verb test for Section 1513). The Cofield court, however, drew an analogy to 18 U.S.C. § 1503, another obstruction of justice statute. In cases under this provision, courts had looked to congressional purpose in enacting the statute and had held that venue was proper, not only where the obstructive acts took place, but also where the effects of the obstruction were felt, i.e., in the location of the judicial proceeding. 11 F.3d at 416–17 (citing United States v. Kibler, 667 F.2d 452 (4th Cir. 1982), and United States v Tedesco, 635 F.2d 902, 905–06 (1st Cir. 1980)). As in Billups, the Cofield court looked to 18 U.S.C. § 1503 for guidance even though that provision, unlike the provision before it, contained verbs denoting actions that occurred in the district where the judicial proceeding took place. See Kibler, 667 F.2d at 454; Tedesco, 635 F.2d at 905. Section 1503 provides punishment for:

Whoever . . . corruptly, or by threats of force, or by any threatening letter or communication, influences, obstructs, impedes, or endeavors to influence, obstruct, or impede, the due administration of justice . . . .

(emphasis added). However, the Cofield court looked beyond these linguistic details and reached its decision based on

_____

14. Section 1513(b)(1) is referred to as Section 1513(a)(1) in Cofield, 11 F.3d at 416.

its view of the nature of the wrongful conduct that Congress sought to reach.[15]

VI.

For these reasons, I would hold that venue in the District of New Jersey was proper, and I would therefore affirm Moreno's Section 924(c)(1) conviction.

A True Copy:
Teste:

<u>Clerk of the United States Court of Appeals</u>
<u>for the Third Circuit</u>

---

15. Two recent circuit cases (ones already discussed in part above) involving challenges to convictions under a provision of the Child Support Recovery Act of 1992 ("CSRA"), 18 U.S.C. § 228, illustrate the importance and relevance of setting forth the correct venue analysis here. See <u>Murphy</u>, __ F.3d __, __, 1997 WL 349887 (4th Cir. 1997) and <u>United States v. Crawford</u>, 115 F.3d 1397, __, 1997 WL 339295 (8th Cir. 1997). The CSRA provides that whoever "willfully fails to pay a past due support obligation with respect to a child who resides in another State" is guilty of a federal crime. 18 U.S.C. § 228(a). The venue issue arises in CSRA cases where a defendant is prosecuted for the "failure to pay" in a state where his or her child resides, but which is neither the state in which the defendant currently resides or the state to which the payment is required to be paid under the relevant court order. In both <u>Crawford</u> and <u>Murphy</u>, the courts held that venue was proper in the state where the child resided, even though the defendant had no connection with that state. See <u>Crawford</u>, 115 F.3d at __, 1997 WL 339295, *8, and <u>Murphy</u>, __ F.3d at __, 1997 WL 349887, *4. For our purposes, it is worth noting that although both <u>Crawford</u> and <u>Murphy</u> found that venue was proper in the state of the child's residence under the verb test, <u>Crawford</u> explicitly states that the "nature of the crime" venue test might be more appropriate than the verb test for venue issues under the CSRA, and <u>Murphy</u> acknowledges the validity of the "nature of the crime" test. See <u>Crawford</u>, 115 F.3d at __, 1997 WL 339295, *8, and <u>Murphy</u>, __ F.3d at__, 1997 WL 349887, * 4 (majority) & *6 (Williams, J., concurring).

47